Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 21, 2022

**2022 CO 31**

**No. 21SA386, *People v. Trujillo-Tucson*—Fifth Amendment Right to Counsel—Invoking the Right to Counsel—Suppression of Statements.**

In this interlocutory appeal of a suppression order, the supreme court asks whether a suspect in custody invoked his Fifth Amendment right to counsel during custodial interrogation. Applying the standard established in *Davis v. United States*, 512 U.S. 452, 461–62 (1994), and elaborated in *People v. Kutlak*, 2016 CO 1, ¶¶ 23–24, 364 P.3d 199, 205–06, the court concludes that, given the totality of the circumstances, the suspect's reference to counsel did not constitute an unambiguous request for counsel. Because the suspect did not invoke his right to counsel, officers were under no obligation to cease questioning, and his statements should not have been suppressed.

**2022 CO 31**

**Supreme Court Case No. 21SA386**
*Interlocutory Appeal from the District Court*
Adams County District Court Case No. 21CR441
Honorable Sean Patrick Finn, Judge

_____

**Plaintiff-Appellant:**

The People of the State of Colorado,

v.

**Defendant-Appellee:**

Isaiah Cain Trujillo-Tucson.

_____

**Order Reversed**
*en banc*
June 21, 2022

_____

**Attorneys for Petitioner:**
Brian Mason, District Attorney, Seventeenth Judicial District
Cameron Munier, Senior Deputy District Attorney
    *Brighton, Colorado*

**Attorneys for Respondent:**
Megan A. Ring, Public Defender
Chris Carraway, Deputy Public Defender
    *Brighton, Colorado*

**JUSTICE HART** delivered the Opinion of the Court, in which **CHIEF JUSTICE BOATRIGHT, JUSTICE HOOD, JUSTICE GABRIEL**, and **JUSTICE SAMOUR** joined.

**JUSTICE GABRIEL**, joined by **JUSTICE HOOD**, specially concurred.

**JUSTICE BERKENKOTTER,** joined by **JUSTICE MÁRQUEZ**, dissented.

JUSTICE HART delivered the Opinion of the Court.

¶1     While in police custody, during a pause in an interrogation, Isaiah Trujillo-Tucson waited in an interview room with a non-interrogating officer while the interrogating officer was off getting Trujillo-Tucson a soda.  The non-interrogating officer was patting Trujillo-Tucson down without pressing for information while Trujillo-Tucson repeatedly initiated mostly casual conversation.  At one point, Trujillo-Tucson asked whether he would be booked in, and the officer responded by explaining that he was not in charge of the investigation and that such a question should be directed to the officer in charge.  Shortly thereafter, Trujillo-Tucson asked, "Am I able to get a phone call? . . . To my lawyer, [E.K.]?" The officer spoke over Trujillo-Tucson during the latter portion of his question to say, "Yeah."  After a brief silence, casual conversation continued.  When the interrogating officer joined the two men in the room to continue questioning, Trujillo-Tucson made incriminating statements.

¶2     After the People charged Trujillo-Tucson with various offenses, Trujillo-Tucson moved to suppress his statements, arguing that questioning should have ceased because he had invoked his right to counsel.  The trial court agreed.  The People filed this interlocutory appeal from the trial court's suppression order pursuant to C.A.R. 4.1(a) and section 16-12-102(2), C.R.S. (2021),

3

arguing that Trujillo-Tucson's question, posed to the non-interrogating officer, was not an unambiguous and unequivocal invocation of his right to counsel.

¶3 Based on our independent review of the video- and audio-recorded interrogation, we conclude that Trujillo-Tucson's question about a phone call to an attorney did not constitute an unambiguous and unequivocal request for counsel during the interrogation. Trujillo-Tucson asked his question during a pause in the interrogation when the interrogating officer was not in the room and while no one was actively questioning him. He posed the question to an officer who had just explained that he was not in charge of the investigation, and the question arose in a casual context in which Trujillo-Tucson demonstrated confidence with officers, familiarity with the criminal justice system, and an ability to request counsel directly should that be his desire. A reasonable officer in these circumstances could have concluded that Trujillo-Tucson's question was a logistical one aimed at exploring his options rather than an immediate request for counsel during interrogation.

¶4 Applying the standard established in *Davis v. United States*, 512 U.S. 452, 461–62 (1994), and elaborated in *People v. Kutlak*, 2016 CO 1, ¶¶ 23–24, 364 P.3d 199, 205–06, officers were therefore under no obligation to cease questioning. Accordingly, we reverse the trial court's suppression order and remand for further proceedings consistent with this opinion.

4

## I. Facts and Procedural History

¶5    On February 12, 2021, officers arrested Trujillo-Tucson based on allegations that he was involved in a shooting. After the arrest, Detectives Jai Rogers and Trevor Tuttle transported Trujillo-Tucson to a police station for questioning. During the drive, Detective Rogers began recording the interrogation[1] and informed Trujillo-Tucson of his *Miranda* rights as follows:

> You have the right to remain silent. Anything you say can be used against you in a court of law. You have a right to have an attorney present with you during the questioning if you choose to. If you cannot afford an attorney, one will be provided for you. And these rights are ongoing continuous rights if you choose to exercise them.

Detective Rogers then asked Trujillo-Tucson, "Do you understand?" And Trujillo-Tucson responded, "Yes, sir."

¶6    Next, Detective Rogers informed Trujillo-Tucson that a woman named Adrianna had accused him of shooting at her while she was driving on I-76. Detective Rogers then questioned Trujillo-Tucson for roughly eight minutes while they traveled to the station. During that time, Trujillo-Tucson answered Detective Rogers's questions and asked a few questions of his own, inquiring as to whether he would be "booked in" and asking questions about Adrianna.

---

[1] The audio and video recordings of the interrogation are in the record before us as People's Exhibit 1. This court has carefully reviewed each of those recordings.

¶7     When the detectives and Trujillo-Tucson arrived at the station, Detective Rogers left to get Trujillo-Tucson a soda.  Detective Tuttle meanwhile took Trujillo-Tucson to an interrogation room.  Upon entering the room, Detective Tuttle began patting Trujillo-Tucson down, and the following conversation ensued:

Tuttle: Before I, uh, get you out of the cuffs—

Trujillo-Tucson: No sharp objects, no weapons, no nothing.

Tuttle: I'm just gonna just pat you down real quick.

Trujillo-Tucson: I've been in jail long enough to know the routine.

Tuttle: What's up?

Trujillo-Tucson: I said I've been in jail long enough to know the routine.

[Silence]

Trujillo-Tucson: Were you part of the chase, too?

Tuttle: Yep.

Trujillo-Tucson: How come you guys didn't just turn on your lights?  I would've pulled over.

Tuttle: Can you just, uh, take a step to your right for me?  Thanks, Brother.

Trujillo-Tucson: If you guys would've just turned on your lights, I would've pulled over.  I thought I was being chased by someone trying to kill me.

Tuttle: You thought you were being chased by someone trying to kill you?

Trujillo-Tucson: Well, I knew you guys were chasing me.  I didn't know it was the cops.  I would've pulled over.

6

[Silence]

Trujillo-Tucson: I was just on my way to go get some pizza and then got hit with a weird white line.

[Silence]

Trujillo-Tucson: Yeah, these shoes ain't good running shoes.

Tuttle: What's up?

Trujillo-Tucson: These shoes ain't good running shoes.

Tuttle: Why's that?

Trujillo-Tucson: Fell off.

Tuttle: Uh-huh, you gotta tighten 'em up.

Trujillo-Tucson: I almost had you.

Tuttle: Who did?

Trujillo-Tucson: If my shoe hadn't fallen off.

Tuttle: Oh [chuckling]. [Inaudible] I'm gonna take these [handcuffs] off. Just go ahead and put that hand on top of your head for me.

Trujillo-Tucson: I know.

[Silence]

Trujillo-Tucson: So am I gonna be booked in?

Tuttle: What's that?

Trujillo-Tucson: Am I being booked in?

Tuttle: Uh, so I'm not the primary detective on this case. Uh, Detective Rogers is.

Trujillo-Tucson: Yes, sir.

Tuttle: So, I would ask him when he gets back here.

Trujillo-Tucson: I caught a cold knee to the face.

Tuttle: What's up?

Trujillo-Tucson: I caught a cold knee to the face.

Tuttle: A cold knee?

Trujillo-Tucson: Yes, sir.

Tuttle: Go ahead and have a seat right there for me.

Trujillo-Tucson: Am I able to just pull up my pants and—

Tuttle: Yeah that's fine.

Trujillo-Tucson: Tuck my pockets in and stuff?

Tuttle: Yeah.

Trujillo-Tucson: Sorry.

Tuttle: You're good.

Trujillo-Tucson: I know you guys . . . you're doing your job.

[Silence]

Trujillo-Tucson: So what allegations are enough to arrest someone?

Tuttle: You [inaudible] have probable cause.

[Silence]

Trujillo-Tucson: Am I able to get a phone call?

Tuttle: Yeah—

Trujillo-Tucson: To my lawyer, [E.K.]?

¶8 Trujillo-Tucson's reference to counsel occurred with the crosstalk depicted here: Detective Tuttle responded, "Yeah," to the question, "Am I able to get a phone call?" at almost the same instant that Trujillo-Tucson added, "to my lawyer, [E.K.]?"

¶9 Roughly thirteen seconds after this exchange, Trujillo-Tucson began speaking with Detective Tuttle again. He complained that his handcuffs had been too tight, showing his wrists to Detective Tuttle and saying, "My hands almost fell off." The two then engaged in chit chat, discussing Trujillo-Tucson's dental work as well as their shared interest in athletic activities such as jiu-jitsu and grappling.

¶10 Five minutes after Trujillo-Tucson's reference to a phone call with his lawyer, Detective Rogers entered the room and began questioning Trujillo-Tucson about the alleged shooting. This questioning continued for roughly ninety minutes, at which point Trujillo-Tucson said to Detective Rogers, "Um, may I please have my lawyer here?"

¶11 The People charged Trujillo-Tucson with several criminal offenses, including three counts of criminal attempt to commit murder in the first degree. Trujillo-Tucson moved to suppress statements made during the interrogation,

9

arguing that he never waived his *Miranda* rights and that he had invoked his right to counsel when he said, "Am I able to get a phone call? . . . To my lawyer, [E.K.]?" The People opposed the motion, contending that Trujillo-Tucson's reference to counsel was not an unambiguous and unequivocal request for counsel that would require officers to stop the questioning.[2] The district court found that Trujillo-Tucson implicitly waived his *Miranda* rights by talking with Detective Rogers after receiving *Miranda* warnings, but it agreed with Trujillo-Tucson that he had "clearly asked for a lawyer and asked for a specific lawyer by name." Finding that Trujillo-Tucson's reference to counsel constituted an unambiguous invocation of the right to counsel during custodial interrogation, the district court suppressed Trujillo-Tucson's subsequent statements.

¶12 The People then brought this interlocutory appeal, challenging the district court's suppression order. Specifically, the People argue that suppression was improper because Trujillo-Tucson's reference to counsel was not a clear invocation of the right to counsel during custodial interrogation.

---

[2] The People also argued that, in the alternative, continued questioning was proper because Trujillo-Tucson reinitiated communication with officers. Neither Trujillo-Tucson's waiver argument nor the People's argument regarding reinitiating communication with officers is before this court.

## II. Analysis

¶13 We begin by outlining the appropriate standard of review. Then, we review the law relating to the Fifth Amendment right to counsel and the requirement that an invocation of the right to counsel must be unambiguous and unequivocal. Finally, we apply the law to the facts of this case and conclude that, under the totality of the circumstances, Trujillo-Tucson's reference to counsel was not an unambiguous invocation of the right to counsel.

### A. Standard of Review

¶14 Our review of a trial court's suppression order is a mixed question of fact and law. *People v. Coke*, 2020 CO 28, ¶ 10, 461 P.3d 508, 512. We defer to the trial court's factual findings where they are supported by sufficient evidence in the record, but we review the legal effect of those findings de novo. *Leyba v. People*, 2021 CO 54, ¶ 11, 489 P.3d 728, 732. Where, as here, "the statements sought to be suppressed are audio- and video-recorded, and there are no disputed facts outside the recording controlling the issue of suppression, we are in a similar position as the trial court to determine whether the statements should be suppressed." *Id.* (quoting *People v. Madrid*, 179 P.3d 1010, 1014 (Colo. 2008)). We may thus "independently review the audio or video recording to determine whether the statements were properly admitted in light of the controlling law." *Id.*

## B. Applicable Law

¶15    The Fifth Amendment of the United States Constitution establishes the privilege against self-incrimination.  *See* U.S. Const. amend. V (providing that no person "shall be compelled in any criminal case to be a witness against himself").  In *Miranda v. Arizona*, 384 U.S. 436, 455 (1966), the Supreme Court recognized that, because "custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals," it threatens that privilege.  As the Court explained, "[a]n individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to [coercive] techniques of persuasion . . . cannot be otherwise than under compulsion to speak."  *Id.* at 461.  To uphold the privilege against self-incrimination in such an environment, the Court required that law enforcement officers conducting a custodial interrogation use certain "procedural safeguards."  *Id.* at 444.

¶16    Relevant here, *Miranda* established that individuals subjected to custodial interrogation have a right to counsel during interrogation, and law enforcement officers must inform them of this right before they initiate questioning.[3]  *Id.* at

---

[3] Of course, these are not the only procedural safeguards *Miranda* requires.  Per *Miranda*, officers must advise persons subject to custodial interrogation that they have the right to remain silent; that anything they say may be used against them; that they have the right to the presence of an attorney during the interrogation; and that, if they are unable to afford an attorney, one will be appointed.  *Id.*

469–71. If a suspect knowingly and voluntarily waives their *Miranda* rights, officers may proceed with the interrogation. *Id.* at 479. However, if the suspect invokes the right to counsel, that right must be scrupulously honored: A suspect, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). This "'rigid' prophylactic rule," *Smith v. Illinois*, 469 U.S. 91, 95 (1984), aims "to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights," *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).

¶17    Given the consequences that flow from an invocation of the right to counsel, the question of whether an individual subjected to custodial interrogation actually invoked their rights arises frequently. Acknowledging the need for "a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information," *Davis*, 512 U.S. at 461, the Supreme Court has explained that an invocation of the right to counsel must be clear and unequivocal: The accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459. As we have previously explained, if the accused "makes a reference to an attorney

13

that is 'ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel,'" officers may proceed with questioning. *Kutlak*, ¶ 15, 364 P.3d at 204 (quoting *Davis*, 512 U.S. at 459). The rationale behind the *Davis* rule is that police should not have to guess about whether an ambiguous statement by a suspect is actually a request for counsel. *Davis*, 512 U.S. at 461; *Kutlak*, ¶ 16, 364 P.3d at 204. The Supreme Court in *Davis*, and this court in *Kutlak*, noted that it would be good practice for officers to ask questions clarifying whether a particular statement is a request for counsel, but that clarifying questions are not required. *Davis*, 512 U.S. at 461; *Kutlak*, ¶ 22, 364 P.3d at 205. Instead, absent an unambiguous request for counsel, an interrogation can continue. *Davis*, 512 U.S. at 462; *Kutlak*, ¶ 23, 364 P.3d at 206.

¶18 This court recently explained that the standard established in *Davis* sets a high bar: It requires courts to ask not whether some reasonable officer *could* have understood that a suspect was invoking the right to counsel, but whether any reasonable officer *would* have drawn that conclusion. *Kutlak*, ¶¶ 22–23, 364 P.3d at 205–06. In *Kutlak*, a suspect received *Miranda* warnings and then stated, "Um [sigh] . . . I mean . . . like . . . can we get [my lawyer] down here *now*, or . . . ?" *Id.* at ¶ 4, 364 P.3d at 201. Rather than ceasing conversation at that point, the officer stated in response, "It may be difficult . . . It may be something we have to do later.

14

It's entirely up to you." *Id.* Kutlak then said that he would "take a dice roll" and talk to police. *Id.* As this court explained, although Kutlak's statement could indicate that he desired counsel, "an equally logical inference . . . is that he was weighing his options and asked a question to help him decide whether to request his counsel's presence." *Id.* at ¶ 27, 364 P.3d at 206. Under those circumstances—despite a fairly direct reference to getting counsel "now"—we concluded that Kutlak's request could not be deemed unambiguous given his uncertain demeanor, tone, and body language, accompanied by the fact that his reference to counsel trailed off and he stated that he would "take a dice roll" and talk to police. *Id.*

¶19 In *Kutlak* we recognized that "suspects 'may not be legally sophisticated or paragons of clarity in their use of language,'" and we emphasized the importance of looking to the totality of the circumstances to decide whether a suspect invoked the right to counsel. *Id.* at ¶ 24, 364 P.3d at 206 (quoting *People v. Romero*, 953 P.2d 550, 554–55 (Colo. 1998)). We emphasized that several factors may be relevant to this analysis, including the words, demeanor, and tone of the attendant officer; the words, speech patterns, and behavior of the accused; the officer's response to any reference to counsel; and "the accused's youth, criminal history, background, nervousness or distress, and feelings of intimidation or powerlessness." *Id.*

¶20 With these principles in mind, we turn to the facts of this case.

15

## C. Application

¶21 Based on our independent review of the audio and video recordings submitted to the trial court, we conclude that Trujillo-Tucson's reference to counsel was not an unambiguous and unequivocal request for counsel. At the outset, we acknowledge that Trujillo-Tucson's words, "Am I able to get a phone call? . . . To my lawyer, [E.K.]?"—standing alone—could be construed as a request for counsel. But we do not ask whether a reasonable officer *could* have believed a suspect requested counsel—we ask whether a reasonable officer *would* have had such an understanding. *Kutlak*, ¶¶ 22–23, 364 P.3d at 205–06. And we do not analyze a suspect's words in isolation—we look to the totality of the circumstances surrounding a suspect's reference to counsel. *Id.* at ¶ 24, 364 P.3d at 206. Given those circumstances here, we hold that, although Trujillo-Tucson's statement *might* have indicated a desire for counsel during interrogation, he did not clearly request counsel.

¶22 The interrogation by Detective Rogers began during the car ride to the police station after the detective gave *Miranda* warnings and Trujillo-Tucson indicated that he understood his rights. Trujillo-Tucson did not invoke his right to counsel at that time. Instead, during the car ride, Trujillo-Tucson answered Detective Rogers's questions and demonstrated some confidence with law enforcement by

16

asking a few questions of his own, including a question as to whether he was going to be "booked in."

¶23 Once Trujillo-Tucson and the detectives arrived at the station, the setting shifted. Detective Rogers—the questioning officer—left to get Trujillo-Tucson a soda while Detective Tuttle took Trujillo-Tucson to an interrogation room. Inside the interrogation room, there was no indication that Detective Tuttle would be questioning Trujillo-Tucson. To the contrary, Trujillo-Tucson repeatedly initiated conversation with Detective Tuttle while Detective Tuttle was doing nothing more than patting him down. To the extent Detective Tuttle "questioned" Trujillo-Tucson, his questions came in the form of responses to Trujillo-Tucson's unsolicited comments. The following exchange is illustrative:

Trujillo-Tucson: Yeah, these shoes ain't good running shoes.

Tuttle: What's up?

Trujillo-Tucson: These shoes ain't good running shoes.

Tuttle: Why's that?

Trujillo-Tucson: Fell off.

Tuttle: Uh-huh, you gotta tighten 'em up.

Trujillo-Tucson: I almost had you.

Tuttle: Who did?

Trujillo-Tucson: If my shoe hadn't fallen off.

Tuttle: Oh [chuckling]. [Inaudible] I'm gonna take these [handcuffs] off. Just go ahead and put that hand on top of your head for me.

Throughout their interactions, which were casual and non-confrontational, Detective Tuttle appeared to be holding Trujillo-Tucson in the interrogation room until Detective Rogers would arrive to continue the questioning and was not himself pressing Trujillo-Tucson for information.

¶24 In fact, Detective Tuttle made clear that he was not the officer in charge of the investigation. During the pat-down, Trujillo-Tucson asked Detective Tuttle whether he would be booked in (having already inquired about this once with Detective Rogers during the drive to the station). But rather than answering Trujillo-Tucson's question, Detective Tuttle explained that such inquiries should be directed elsewhere:

Trujillo-Tucson: Am I being booked in?

Tuttle: Uh, so I'm not the primary detective on this case. Uh, Detective Rogers is.

Trujillo-Tucson: Yes, sir.

Tuttle: So, I would ask him when he gets back here.

¶25 It was only after this explanation that Trujillo-Tucson eventually asked, "Am I able to get a phone call? . . . To my lawyer, [E.K.]?" An officer who had just explained that he was not in charge of the investigation and that questions about being booked in should be directed to the officer in charge could have reasonably

18

interpreted this inquiry as a logistical one—not so much an immediate request for counsel as much as a question about what options would generally be available. *Cf. Kutlak*, ¶ 27, 364 P.3d at 206 (explaining that suspect's question—"Can we get [my attorney] down here *now* . . . or . . ."—could have indicated that suspect was weighing his options and asking a question to decide whether to request counsel). Moreover, given the crosstalk that occurred, it is not clear that a reasonable officer under the circumstances would have heard the latter portion of Trujillo-Tucson's question when he asked not just for a phone call but for a phone call to a lawyer.

¶26 Additionally, throughout his conversation with Detective Tuttle, Trujillo-Tucson maintained a calm demeanor and demonstrated confidence in his interactions with law enforcement officers. Not only did he initiate conversation with the detective and direct questions toward him, he made a joke, suggesting that he would have gotten away from police if his shoe had not fallen off. Likewise, Trujillo-Tucson maintained a casual conversation with Detective Tuttle even after asking about a phone call to his attorney. Further, he spoke in fluent English, belying any notion that communication difficulties hindered his ability to request counsel directly. And although video footage indicates that Trujillo-

19

Tucson is young, his confident style with officers indicated that he was not so young or timid as to be unable to make a clear request for counsel.[4]

¶27 Trujillo-Tucson also made several statements indicating familiarity with the criminal justice system. He asked whether he would be "booked in," inquired about the allegations against him, and understood what would happen as Detective Tuttle patted him down. While Detective Tuttle was patting him down, Trujillo-Tucson said, "No sharp objects, no weapons, no nothing," and he explained that he had "been in jail long enough to know the routine." Similarly, when Detective Tuttle asked Trujillo-Tucson to put his hands on top of his head, Trujillo-Tucson said, "I know."

¶28 In other words, Trujillo-Tucson's reference to counsel occurred under circumstances where an objectively reasonable officer would not have understood his comment to be an immediate request for counsel—even if we assume that a

---

[4] The parties dispute the significance of the fact that, when he asked about a phone call to an attorney, Trujillo-Tucson first looked directly at Detective Tuttle, then at the table, and then at the wall. According to Trujillo-Tucson, looking directly at Detective Tuttle implied that Trujillo-Tucson was firm in his desire for counsel, while the fact that he later looked at the wall evinced timidity in the custodial environment. In contrast, the People argue that Trujillo-Tucson's looking down at the table and then toward the wall suggested that he was undecided about the presence of counsel. We conclude that Trujillo-Tucson's movements during his reference to counsel reveal little about whether his request was unambiguous and unequivocal.

20

reasonable officer under the circumstances would have heard his entire question. Trujillo-Tucson referred to counsel during a casual conversation in which he was not being pressed for information, but rather, which he led. He made his comment not to the interviewing officer who had given him *Miranda* warnings but to an officer who was simply holding him in a room and who had explained that he was not in charge of the investigation. And, given his casual tone, calm demeanor, confidence with officers, and familiarity with the criminal justice system, Trujillo-Tucson gave the impression that he was perfectly capable of directly requesting counsel had that been his desire.

¶29 To be clear, we do not establish a rule suggesting that a suspect's request to call an attorney will always be insufficient to constitute an unambiguous and unequivocal request for an attorney. Rather, we simply conclude that, given the totality of the circumstances in this case, Trujillo-Tucson's reference to counsel was not unambiguous and thus did not require officers to immediately cease any questioning.

### III. Conclusion

¶30 Because Trujillo-Tucson's reference to counsel did not constitute an unambiguous invocation of the right to counsel during custodial interrogation, his statements should not have been suppressed on that basis. Accordingly, we

reverse the decision of the district court and remand for further proceedings consistent with this opinion.

**JUSTICE GABRIEL**, joined by **JUSTICE HOOD**, specially concurred.

**JUSTICE BERKENKOTTER**, joined by **JUSTICE MÁRQUEZ**, dissented.

JUSTICE GABRIEL, joined by JUSTICE HOOD, specially concurring.

¶31     For the reasons set forth in my dissent in *People v. Kutlak*, 2016 CO 1, ¶¶ 33–57, 364 P.3d 199, 208–12 (Gabriel, J., dissenting), I believe that that case was wrongly decided, and were it not for that opinion, I would vote to affirm the trial court's suppression order in this case.  Under principles of stare decisis, however, I am bound by our decision in *Kutlak*, and I believe that it controls our determination here.

¶32     Accordingly, I respectfully concur in the majority opinion.

JUSTICE BERKENKOTTER, joined by JUSTICE MÁRQUEZ, dissenting.

¶33     Following a police chase, twenty-two-year-old Isaiah Cain Trujillo-Tucson was taken into custody in connection with an attempted first-degree-murder investigation. Trujillo-Tucson was eventually escorted into an interrogation room. There, he and Detective Tuttle chatted while Detective Tuttle patted him down. Then, after being told to take a seat and assessing the gravity of his situation, Trujillo-Tucson asked, "Am I able to get a phone call [pause] to my lawyer, [E.K.]?" "Yeah," Detective Tuttle replied, speaking slightly over Trujillo-Tucson.

¶34     Like the trial court, I perceive no equivocation or ambiguity in Trujillo-Tucson's request. Trujillo-Tucson not only asked for *a* lawyer—he asked for *his* lawyer and then specifically *identified her by name*. But even if you look further, none of the circumstances the majority looks to—Trujillo-Tucson's confidence with the detective, calm demeanor, or his claimed familiarity with the criminal justice system—changed the plain meaning of his request or rendered it equivocal or ambiguous. In fact, these are all circumstances that, typically, are seen as reasons why a reasonable officer *would* have understood a suspect's words to be an invocation of his right to have counsel present under the Fifth Amendment of the United States Constitution. *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981); *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). These circumstances are also essential to understanding why Trujillo-Tucson's invocation is readily

1

distinguishable from the circumstances surrounding the defendant's statement in *People v. Kutlak*, 2016 CO 1, 364 P.3d 199.

¶35 This case also raises an important issue of first impression: If a suspect makes an otherwise unambiguous and unequivocal statement that he wishes to have counsel present, is that invocation rendered ambiguous and equivocal because an officer may have failed to hear it? I would adopt the "reasonable police officer" standard espoused by other state courts in this context because this objective standard avoids difficulties of proof and provides guidance to interrogating officers—and also protects suspects' Fifth Amendment rights without unduly burdening law enforcement. *State v. Chavarria-Cruz*, 784 N.W.2d 355, 362-63 (Minn. 2010); *Cox v. Commonwealth*, 641 S.W.3d 101, 118 (Ky. 2022). Applying that objective standard, I would conclude that a reasonable officer in Detective Tuttle's situation would have heard and understood Trujillo-Tucson.

¶36 Because I believe Trujillo-Tucson clearly invoked his right to counsel, I respectfully dissent.

## I. Analysis

### A. Standard of Review

¶37 The majority accurately summarizes the relevant standard of review of a trial court's suppression order: We defer to the trial court's factual findings where they are supported by sufficient evidence in the record, but we review the legal

effect of those findings de novo. *Leyba v. People*, 2021 CO 54, ¶ 11, 489 P.3d 728, 732; *Kutlak*, ¶ 13, 364 P.3d at 203 ("[W]here the statements sought to be suppressed are audio- and video-recorded, and there are no disputed facts outside the recording controlling the issue of suppression, we are in a similar position as the trial court to determine whether the statements should be suppressed.") (quoting *People v. Madrid*, 179 P.3d 1010, 1014 (Colo. 2008) (alteration in original)).

## B. Invoking the Right to Counsel

¶38 As the majority observes, the Fifth Amendment to the United States Constitution establishes the privilege against self-incrimination. U.S. Const. amends. V, XIV; *see also* Colo. Const. art. II, § 18. To protect that privilege, the *Edwards* rule provides that if a suspect invokes their right to have counsel present during custodial interrogation, interrogation must stop until either (1) an attorney has been made available or (2) the suspect validly waives their earlier request for an attorney by initiating further communication with the police. 451 U.S. at 484–85.

¶39 To trigger *Edward*'s "rigid prophylactic rule," an accused's request for counsel must be unambiguous. *Kutlak*, ¶ 15, 364 P.3d at 204. In *Davis v. United States*, 512 U.S. 452, 459 (1994), the Supreme Court clarified the standard for determining ambiguity in a purported invocation. Invocation requires "at a minimum, some statement that can reasonably be construed to be an expression

3

of a desire for the assistance of an attorney." *Id.* (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). Thus, as we reiterated in *Kutlak*, "to make an unambiguous request for counsel, the suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances *would* understand the statement to be a request for an attorney.'" *Kutlak*, ¶ 16, 364 P.3d at 204 (quoting *Davis*, 512 U.S. at 459) (alteration in original).

¶40 "To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry," *Davis*, 512 U.S. at 458–59, which requires courts to consider the totality of the circumstances, *Kutlak*, ¶ 24, 364 P.3d at 206. The totality of the circumstances may include such factors as: "the words spoken by the interrogating officer; the words used by the accused in referring to counsel; the officer's response to the accused's reference to counsel; the speech patterns of the accused; the demeanor and tone of the interrogating officer; the accused's behavior during interrogation; and the accused's youth, criminal history, background, nervousness or distress, and feelings of intimidation or powerlessness." *Id.*

¶41 As the permissive "may" makes clear, the reviewing court need not take into account all of these factors, but only those that may be relevant to the case at hand. *See People v. Arroya*, 988 P.2d 1124, 1133 (Colo. 1999) ("A trial court need not

make specific findings with respect to each of these factors, and no single factor is controlling.").

## II. Application

## A. Trujillo-Tucson's Invocation

¶42 In my view, the meaning of Trujillo-Tucson's request: "Am I able to get a phone call [pause] to my lawyer, [E.K.]?" was unequivocal and unambiguous. Thus, no further interpretation is needed. *See Connecticut v. Barrett*, 479 U.S. 523, 529 (1987) ("Interpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous."). We do not require suspects to use talismanic language to ask for an attorney during interrogation. *See Kutlak*, ¶ 24, 364 P.3d at 206. And because many people, including many suspects, do not speak like lawyers or judges, I believe a reasonable law enforcement officer standing in an interrogation room, waiting for the interrogation of a suspect to resume, would understand that Trujillo-Tucson was asking, "Can I call my lawyer?" Put another way, it is difficult to imagine that there could be any alternative interpretations of Trujillo-Tucson's request.

¶43 The majority nonetheless surmises that the question *could* have been understood as a logistical one about "what options would generally be available." Maj. op. ¶ 25. But, applying that logic, even the clearest invocation if asserted in

5

the form of a question—like "Can I call my lawyer?"—could be understood to be posing merely a logistical query.

¶44    And even if you parse Trujillo-Tucson's request—like an Oxford don—the meaning is just as apparent. "Am I able," is the present tense of "to be able." That is, it is the equivalent of "can I," which is a manner of asking for permission. *Can*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/can [permalink forthcoming] (defining "can" as, among other things, to "be enabled by law, agreement, or custom"). In *United States v. Hunter*, 708 F.3d 938, 943–44 (7th Cir. 2013), the Seventh Circuit observed that the word "can" had consistently been interpreted in that jurisdiction to imply immediacy:

> All three defendants [in the cases *Hunter* analyzed] asked questions of a police officer who had previously read the defendants their *Miranda* rights. Instead of using a word like "should" or "might," which would suggest that the defendants were still undecided about whether they wanted a lawyer, all three defendants used the word "can." The defendants' choice of the word "can," by definition, means that they were inquiring into their present ability to be "able to" obtain a lawyer or to "have the opportunity or possibility to" obtain a lawyer.

(quoting    *Can*,    Oxford    Dictionaries    Pro    Online, http://english.oxforddictionaries.com/definition/can?region=us&rskey=OBo6r G&result=1 (last visited Feb. 26, 2013)). I see no reason to depart from this sound reasoning here.

6

¶45    Perhaps it is the question's fairly obvious meaning that prompts the majority to acknowledge that Trujillo-Tucson's words—standing alone—"could be" construed as a request for counsel. Maj. op. ¶ 21. But it nonetheless concludes that in light of the totality of the circumstances a reasonable officer *would* not have understood Trujillo-Tucson's question as a request for counsel. *Id.* It reaches this conclusion by zeroing in on what it describes as Trujillo-Tucson's casual tone, calm demeanor, confidence with the officers, and familiarity with the criminal justice system. *Id.* at ¶ 28. The majority then goes on to suggest that because Detective Tuttle did not advise Trujillo-Tucson of his *Miranda* rights, *and* because Detective Tuttle told Trujillo-Tucson that he was not the lead detective, *and* because Detective Tuttle was not interrogating Trujillo-Tucson at the time of the invocation, a reasonable officer would not have understood Trujillo-Tucson to be invoking his right to counsel. *Id.* at ¶¶ 25, 28. The majority's logic implies a troubling proposition: that a reasonable officer would not have understood the invocation because Detective Tuttle was not in charge of the investigation and the invocation did not occur during active interrogation. *Id.* at ¶ 28. This, to my mind, is where the majority veers off track.

7

### B. *Davis*'s Objective Test Applies to the Question of Whether a Reasonable Officer Would Have Heard a Suspect's Invocation, an Issue of First Impression

¶46    This case raises an important issue of first impression: If a suspect makes an otherwise unambiguous and unequivocal statement that he wishes to have counsel present, is that invocation rendered ambiguous and equivocal because an officer may have failed to hear or understand it? The two state courts that have addressed this issue have employed the "reasonable police officer" standard in this context for the reasons explained in *Davis*—the objective standard avoids difficulties of proof and provides guidance to interrogating officers—but it also protects suspects' Fifth Amendment rights without unduly burdening law enforcement. *Chavarria-Cruz*, 784 N.W.2d at 362–63; *Cox*, 641 S.W.3d at 118.

¶47    In *Chavarria-Cruz*, the Minnesota Supreme Court reiterated that *Davis*'s objective standard applies both when evaluating the suspect's words *and their manner* in speaking them, and thus the *Davis* standard applies even when "the question is whether a suspect's words were spoken loudly enough to be heard." *Chavarria-Cruz,* 784 N.W.2d at 362. In that case, the detective described the suspect as "very soft spoken" with a "pronounced" accent and did not remember the suspect using the word "lawyer" during the interview. *Id.* at 360. But he admitted at the motions hearing that he could understand the reference to a lawyer on the tape recording of the interview. *Id.* at 360. The district court concluded that the

detective subjectively did not hear the request and, accordingly, denied the suspect's request to suppress the statement. *Id.* at 361.

¶48 On appeal, the Minnesota Supreme Court reversed, explaining that the district court's subjective test would "essentially creat[e] an exception to the objective, 'reasonable officer' analysis for cases where the officer testifies that the suspect's statement was spoken too quietly to be heard." *Id.* at 362. The court further reasoned that maintaining the objective test when assessing a suspect's *manner*—including the audibility of the suspect's statement—imposed no new burdens on law enforcement, who already had an incentive to "ensur[e] that all of the suspect's words are clear and audible" to the investigating officer. *Id.* The court, thus, elaborated that "[a] 'reasonable officer' is one with ordinary hearing abilities who has taken steps to ensure that clear communication can occur between the officer and the suspect" and is "attentive to the suspect's answers to questions." *Id.* at 363.

¶49 In *Cox*, the Kentucky Supreme Court likewise concluded that *Davis*'s objective test applied to the same issue of first impression we address in this case. 641 S.W.3d at 118. The Kentucky court adopted much of *Chavarria-Cruz*'s reasoning, including its additional contours for what constitutes a reasonable officer: such an officer will (1) have ordinary hearing abilities; (2) ensure clear

9

communication with the suspect; and (3) be attentive to the suspect's answers. *Id.* at 120–21.

¶50 When the question is whether an officer would have understood a suspect invoked the right to counsel (as distinguished from having heard the invocation), we employ *Davis*'s "reasonable police officer" standard. We follow this approach because it "avoid[s] difficulties of proof" and "provide[s] guidance to officers conducting interrogations." *Davis*, 512 U.S. at 458–59; *see Kutlak*, ¶¶ 15–16, 23, 364 P.3d at 204, 206 (noting the *Davis* standard is an objective standard and discussing the rationale for the *Davis* approach). This "objective approach protects suspects' Fifth Amendment right against compelled self-incrimination without placing any special burden on law enforcement," and its extension to evaluating the manner or audibility of a suspect's speech strikes the same balance. *Chavarria-Cruz*, 784 N.W.2d at 362. As other jurisdictions have recognized, officers conducting investigations already have "a strong interest in facilitating effective communication in order to gather information." *Id.* "That interest includes ensuring that all of a suspect's words are clear and audible . . . and paying careful attention to the suspect when they speak." *Id.*

¶51 For these reasons, in cases involving a claim—like the one in this case—that an officer may not have heard an invocation, I would apply the *Davis* objective test, consistent with the Supreme Court's jurisprudence and our own, to determine

if a reasonable officer, with ordinary hearing abilities, would have heard a suspect's invocation of the right to have counsel present. *See Davis*, 512 U.S. at 458–59; *see also Kutlak*, ¶ 23, 364 P.3d at 205–205 (reiterating our court's application of the *Davis* standard).

¶52 And, at first blush, it appears the majority has followed this path. Though it does not articulate the pertinent legal standard, it concludes that "given the crosstalk that occurred, it is not clear that *a reasonable officer* under the circumstances would have heard the latter portion of Trujillo-Tucson's question when he asked not just for a phone call but for a phone call to a lawyer." Maj. op. ¶ 25 (emphasis added). But that is the sum total of the majority's objective reasonable officer analysis (to the extent it purported to apply that standard).[5]

¶53 Applying the objective reasonable officer standard here, I would look to Trujillo-Tucson's ongoing one-on-one interaction with Detective Tuttle in the interrogation room, and the quiet environment in which the request was made.[6] I view the crosstalk as fleeting. Trujillo-Tucson looks at Detective Tuttle and begins

---

[5] That may be because it ultimately concludes that even if Detective Tuttle heard the request, a reasonable officer would not interpret Trujillo-Tucson's question as a request for counsel.

[6] In a louder, more chaotic situation, the outcome—applying an objective standard—might well be different.

11

"Am I able to get a phone call." Then he pauses. Detective Tuttle answers "yeah" just as Trujillo-Tucson finishes "to my lawyer [E.K.]." The officer's "yeah" does not last long enough to cover the end of Trujillo-Tucson's sentence.

¶54 I would also consider whether Detective Tuttle was focused and engaged or distracted. To my way of thinking, it is important here that when the detective was patting Trujillo-Tucson down and did not hear or understand him, the detective *immediately* followed up—asking "What's up?" not once, not twice, but *six times*—to make sure that he heard or understood what Trujillo-Tucson had said. It is just as important here, that Detective Tuttle picked up a cell phone and looked at it just as Trujillo-Tucson started to invoke. This is important because it shows that the detective was distracted at this critical moment. It also provides more context for Trujillo-Tucson's request to call his lawyer. A request by a suspect to call his lawyer upon seeing a detective pull out a cell phone does not seem logistical or equivocal, it seems specific and unambiguous.

¶55 Under these circumstances, I would conclude that *a reasonable officer* alone in a quiet interrogation room, waiting for interrogation to resume, in the midst of interacting with a suspect, who was speaking at an unquestionably audible volume, *would have heard* Trujillo-Tucson's request for his lawyer, E.K.

12

## C. Under the Supreme Court's and Our Precedent, It Does Not Matter that Trujillo-Tucson Invoked to Someone Other Than the Lead Detective

¶56 In concluding that a reasonable officer *would not have understood* that Trujillo-Tucson was invoking his right to have counsel present, the majority gives great weight to the fact that Detective Tuttle told Trujillo-Tucson that he was not the lead detective, that Detective Tuttle was not the officer who gave Trujillo-Tucson his *Miranda* advisement, and that Detective Tuttle was not asking Trujillo-Tucson questions at the time Trujillo-Tucson asked to call his lawyer, E.K. Maj. op. ¶¶ 25, 28. It also points to Detective Tuttle directing Trujillo-Tucson to Detective Rogers to ask if Trujillo-Tucson is being booked in. *Id.* at ¶ 25. To be sure, the meaning of Trujillo-Tucson's words might have been even more obvious if uttered to the lead detective in the midst of interrogation. But it doesn't follow that his question was ambiguous just because he asked a different detective while they were waiting for the interrogation to resume.[7] This view seems to suggest that ambiguity is injected into every invocation made under less than the most obvious circumstances. This approach seems like a slippery slope

---

[7] It is undisputed in this case that Trujillo-Tucson was subject to custodial interrogation, as defined by our jurisprudence, at the time he uttered the statement in question and thus that *Miranda*'s Fifth Amendment protections applied.

13

that is particularly ill-suited to the countless ways that invocation plays out in the real world. What about invocations that are made at the scene to arresting officers, or blurted out pre-*Miranda* advisement, or during booking, or during a break in active interrogation?

¶57 I am aware of no legal authority that supports what seems to be the majority's underlying assumption that different officers have differing degrees of responsibility vis-à-vis *Miranda*. *See United States v. Kelsey*, 951 F.2d 1196, 1199 (10th Cir. 1991) (We find no merit in the Government's argument that *Edwards* should not apply because the officers to whom Kelsey made his request for counsel were not the officers who later questioned him.). This argument has been rejected by the Supreme Court, the Tenth Circuit, and this court. *Arizona v. Roberson*, 486 U.S. 675, 687–88 (1988); *United States v. Scalf*, 708 F.2d 1540, 1544 (10th Cir. 1983) ("[O]nce a suspect has invoked the right to counsel, knowledge of that request is imputed to all law enforcement officers who subsequently deal with the suspect."); *People v. Vigoa*, 841 P.2d 311, 314 (Colo. 1992) (applying *Roberson*); *see also People v. Vasquez*, 155 P.3d 588, 591 (Colo. App. 2006) ("Later interrogators are charged with the knowledge of a suspect's invocation of his right to counsel because of the presumption that the suspect considers himself unable to deal with the pressures of custodial interrogation without legal assistance.").

### D. Under the Supreme Court's Precedent and *Kutlak*, Trujillo-Tucson Invoked His Right to Counsel.

¶58    So, can the majority's analysis stand if the only basis for concluding that Trujillo-Tucson's request was equivocal and ambiguous was his casual tone, calm demeanor, confidence with the officers, and familiarity with the criminal justice system?  I conclude it cannot, particularly if you examine the context in which the request was made.  To begin, I agree with the majority that when officers brought Trujillo-Tucson into the interrogation room, he initiated what seems to be casual conversation with Detective Tuttle.  But, in my view, there is an important shift in the interaction between the two men shortly before Trujillo-Tucson asks to call his attorney.

¶59    That is, in the video- and audio- recordings, you can see and hear Trujillo-Tucson begin to assess the gravity of the situation.  First, he asks if he is being booked in.  Then, after being directed to have a seat at the table in the interrogation room, he asks, "So, what allegations are enough to arrest someone?"  When Detective Tuttle answers, "You [inaudible] have probable cause," Trujillo-Tucson is silent for several moments and then looks Detective Tuttle in the eye and asks, "Am I able to get a phone call to my lawyer, [E. K.]?"  In that moment, Trujillo-Tucson displayed no indecision whatsoever.

¶60    The majority, however, turns that lack of indecision on its head to argue that Trujillo-Tucson's confidence and certainty render his request to call his

15

attorney equivocal. In my view, however, under the Supreme Court's case law and our own, confidence and certainty in a request have traditionally weighed in favor of finding a request to be *un*equivocal and *un*ambiguous. And, indeed, Trujillo-Tucson's invocation here was more certain, more immediate, and stronger than statements that the Supreme Court has found evoked a certain and present desire for counsel under the Fifth Amendment.

¶61 For example, in the case that gives us the rule that both the majority and I apply today, *Edwards*, the Court concluded that the suspect's statement, "I want an attorney before making a deal," unambiguously "expressed his desire to deal with the police only through counsel." 451 U.S. at 478, 484. There, the suspect made this statement well into the interrogation, after he had waived his *Miranda* rights, and his phrasing even appeared to condition his request on another action—making a deal. *See id.* at 478–79. Yet the Supreme Court concluded this statement was sufficiently clear to unambiguously invoke the suspect's right to counsel. *Id.* at 484.

¶62 Similarly, in *Smith v. Illinois*, 469 U.S. 91, 96–97 (1984) (per curiam), the Supreme Court found that the suspect's response, "Uh, yeah. I'd like to do that," to an officer asking if he understood his right to counsel, was an unambiguous invocation of that right. Specifically, the Court found that "with the possible exception of the word 'uh' the defendant's statement in this case was neither

16

indecisive nor ambiguous"; indeed, to the contrary, it appeared "clear and unequivocal." *Id.* at 97 (quoting, respectively, *People v. Smith*, 466 N.E.2d 236, 241–42 (1984) (Simon, J., dissenting); *People v. Smith*, 447 N.E.2d 556, 559 (1983), *aff'd* 466 N.E.2d 236 (1984), *rev'd sub nom. Smith*, 469 U.S. 91 (1984)).

¶63 The outcome under our precedent is no different. For example, Trujillo-Tucson's statement did not express the kind of indecision which created ambiguity in *Kutlak*. In *Kutlak*, after undertaking an independent review of the audio- and video-recordings, this court concluded that, under the totality of the circumstances, Kutlak's question to the detective—"Um [sigh]. . . I mean . . . like . . . can we get [my lawyer] down here now, or . . . ?"—was not an unambiguous and unequivocal assertion of Kutlak's right to counsel. *Kutlak*, ¶¶ 4, 27, 364 P.3d at 210, 206. In reaching this conclusion, we relied heavily on "the way [Kutlak] shrugged when he asked, 'can we get him down here *now*, or . . .?' coupled with the general uncertainty reflected in his demeanor," which we found "suggest[ed] that he was merely inquiring how long it might take to acquire counsel's presence." *Id.* (emphasis in original). Given this marked indecision in speech and conduct, this court concluded it was equally logical to interpret Kutlak as "weighing his options" by "ask[ing] a question to help him decide whether to request his counsel's presence." *Id.* In addition, this court noted Kutlak's question about whether he might be able to go home that day and his conscious decision,

17

articulated almost immediately, to "take a dice roll" by speaking to the police, as well as the detective's attempt to clarify what Kutlak was requesting, to underscore our conclusion that Kutlak's statement was ambiguous. *Id.* at ¶¶ 28–29, 364 P.3d at 206–07.

¶64 But here, Trujillo-Tucson's demeanor was essentially the opposite of Kutlak's. Trujillo-Tucson did not shrug. He did not express indecision. He did not use phrases like "but," "maybe," or "should I?" which project uncertainty or elicit advice. *Cf. Davis*, 512 U.S. at 462 (finding the phrase "*Maybe* I should talk to a lawyer" was not a request for counsel) (emphasis added). His statement lacked even the ambiguity of the future tense. *Cf. Hunter*, 708 F.3d at 945 (noting that the phrase "going to" "indicates a possible desire to obtain an attorney in the future, not presently") (emphasis in original).

¶65 Trujillo-Tucson also never made an explicit decision to continue the interview without counsel and at his own risk, as Kutlak did when he said—*twice*—that he would "take a dice roll" and speak to the police. *Kutlak*, ¶ 28, 364 P.3d at 206–07. To the contrary, Trujillo-Tucson's request came just after Detective Tuttle appeared to confirm to Trujillo-Tucson that the detective believed they had sufficient probable cause. This timing again confirms the unambiguousness of Trujillo-Tucson's request, as it "came on the heels" of his asking for information related to the gravity of his situation. *See Hunter*, 708 F.3d

18

at 946–47 (finding the fact that a request for counsel that "came on the heels" of the suspect inquiring about the evidence and charges against him indicated the inherent unambiguousness of the suspect's request, "Can you call my attorney?").

¶66   Detective Tuttle's conduct, moreover, clearly contrasts with the detective's conduct in *Kutlak*, which we found confirmed the ambiguity of the question in that case. The *Kutlak* detective sought to clarify whether Kutlak was requesting counsel, repeated Kutlak's rights to him, reiterated Kutlak's ability to end the interview whenever he wanted, and obtained Kutlak's clear waiver of his *Miranda* rights subsequent to Kutlak's ambiguous request. *Kutlak*, ¶¶ 28–29, 364 P.3d at 206–07. The detective's decision to clarify, rather than to proceed immediately with questioning in the face of an ambiguous statement, reflected the best practice recommended by *Davis*. *See* 512 U.S. at 461 ("Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney.").

¶67   And though Detective Tuttle's silence initially honored Trujillo-Tucson's invocation, his inaction once Detective Rogers reinitiated interrogation, conversely, undermined the purpose of the *Edwards* rule. That is, instead of ending the interview and providing Trujillo-Tucson with the phone call he requested—instead of scrupulously honoring Trujillo-Tucson's right to counsel—Detective Tuttle ultimately permitted his partner to interrogate Trujillo-

19

Tucson as if nothing had happened. In short, Detective Tuttle ignored Trujillo-Tucson's clear invocation of his Fifth Amendment right to counsel.

¶68    But the final way in which *Kutlak* is distinguishable is perhaps the most telling: the majority offers no reasonable alternative reading of Trujillo-Tucson's request for counsel that could render his request ambiguous.[8]   Though the majority summarily suggests that Trujillo-Tucson's question may have been a "logistical," query "about what options would generally be available" to him, it fails to identify any aspect of the language he used or his demeanor that would support such a reading. Maj. op. ¶ 20. In *Kutlak*, this reading was supported in great detail by the context of Kutlak's statement, the words he used — including his indecisive "um" and open-ended "or" at the end of his question — the shrug of his shoulders, the detective's interpretation of the question as eliciting more information, and Kutlak's subsequent statements indicating a conscious decision to speak to law enforcement absent an attorney.  ¶¶ 27–30, 364 P.3d at 206–07. There are no such facts in Trujillo-Tucson's case.

---

[8] Nor could it. Trujillo-Tucson's question did not elicit information to help him "weigh[] his options" nor did it "help him decide whether to request his counsel's presence." *Kutlak*, ¶ 27, 364 P.3d at 206.

¶69　But the majority does not compare its application of the objective test in this case to our application of the objective test in *Kutlak*. Instead, it only suggests that, given the totality of the circumstances, Trujillo-Tucson "gave the impression that he was perfectly capable of directly requesting counsel had that been his desire." Maj. op. ¶ 28. But that is exactly what Trujillo-Tucson did—he looked directly at Detective Tuttle and asked to call his attorney. At bottom, the majority appears to suggest that Trujillo-Tucson knew how to frame a better request or at least to ask again if he didn't get what he wanted.

¶70　More than that, though, the majority seems to suggest that law enforcement officers have differing degrees of responsibilities vis-à-vis *Miranda* and that an invocation is somehow ambiguous when it is made to someone other than the "lead detective" or outside active interrogation. Again, I agree that the meaning of Trujillo-Tucson's words might have been even more obvious if uttered in the midst of interrogation. But it does not follow that invocations that occur in anything other than the most obvious situations are somehow ambiguous. As noted, the majority's approach seems like a slippery slope that is particularly ill-suited to the countless ways that invocation plays out in the real world. What about invocations that are made at the scene to arresting officers, or blurted out pre-*Miranda* advisement, or during booking, or during a break in active interrogation, or . . . the list could go on and on.

21

¶71 And finally, to the extent that the majority implies that Trujillo-Tucson should have stated his request as a demand rather than a question or repeated or rephrased his question, I can again find no support for this view in our jurisprudence or that of the Supreme Court. Though Trujillo-Tucson framed the request in the form of a *question*, this court has never before suggested that the invocation of the right to counsel cannot be asserted in this manner. *See People v. Harris*, 552 P.2d 10, 12 (Colo. 1976) ("The fact that the accused did not 'demand' an attorney does not persuade us that he was not exercising his rights."); *see also People v. Adkins*, 113 P.3d 788, 790–91 (Colo. 2005) (finding a suspect's questions, "Why don't I have [a lawyer] now?" and "How come I don't have a lawyer right now?" were unambiguous assertions of his right to counsel), *overruled on other grounds by Kutlak*, ¶¶ 22–23, 364 P.3d at 205–06. Such a view, moreover, is at odds with *Davis*, which makes it clear that suspects need not "speak with the discrimination of an Oxford don." *Davis*, 512 U.S. at 459 (quoting *id.* at 476 (Souter, J., concurring in judgment)). Yet that is what the majority appears to require in this case. If this is now the rule, we should provide the public with the talismanic language they must use to invoke their rights. *Cf. In re H.V.*, 252 S.W.3d 319, 326 (Tex. 2008) ("While police often carry printed cards to ensure precise *Miranda* warnings, the public is not required to carry similar cards so they can give similarly precise responses.") (internal citation omitted).

¶72 I cannot interpret Trujillo-Tucson's statement as anything but a request for counsel, and I find there is nothing in the surrounding circumstances that injects ambiguity into his invocation of his right to counsel in this case.

## III. Conclusion

¶73 Trujillo-Tucson not only asked for *a* lawyer—he asked for *his* lawyer and then specifically *identified her by name*. Because the plain meaning of his request: "Am I able to get a phone call [pause] to my lawyer, [E. K.]?" was unambiguous, no further interpretation is needed. And even if you look further, Trujillo-Tucson's casual tone, calm demeanor, confidence, and familiarity with the criminal justice system did nothing to change the plain meaning of his request or render it equivocal or ambiguous. Because a reasonable officer under these circumstances, *would* have heard his request and understood it to be an invocation of his right to have counsel present, I would affirm the trial court's order suppressing Trujillo-Tucson's statements from that point forward and, therefore, I respectfully dissent.