**The PEOPLE of the State of Colorado, Plaintiff–Appellant**

v.

**Lee Anthony MADRID, Defendant– Appellee.**

**No. 07SA326.**

Supreme Court of Colorado, En Banc.

April 7, 2008.

Adams County District Court suppressing statements the defendant made while in police custody. We find that the trial court erred in suppressing statements the defendant made before receiving a *Miranda* warning, because those statements were not the product of interrogation. We also find that the trial court erred in suppressing statements the defendant made after receiving a *Miranda* warning and waiving his rights, because the evidence does not support the conclusion that the defendant's *Miranda* waiver was coerced. We therefore reverse the trial court's suppression order and remand for further proceedings.

## I. Facts and Procedural History

On October 29, 2006, Defendant Lee Anthony Madrid was arrested in connection with the investigation of a fatal shooting that morning. Madrid was brought to the Thornton police department and placed in an interview room equipped with audio- and video-recording equipment. Detective George Poynter initially answered some of Madrid's questions about Madrid's wife, who was also involved in the incident; after that exchange, the conversation proceeded as follows:

[Madrid]: I have a family and kids (unintelligible).

[Det. Poynter]: Oh and that's, that's who you need to be thinkin' of right now is your family and your kids. Cause you know I know what happened tonight was probably not planned, probably was a mistake even. Um but nevertheless it did happen and so now what we need to try to do is we need to try, we know what happened now we need to try and figure out why and what the reasons behind it were, ok. And to tell you how severe this is is we have a, a man that's dead.

[Madrid]: I understand that I, I didn't even realize how bad it turned out to be.

[Det. Poynter]: Right. Well and, and that's how you know that's the unfortunate part of this is that—

[Madrid]: I feel sorry for that young man but what, whoever he is, I don't wish that upon anybody sir.

Don Quick, District Attorney, Seventeenth Judicial District, Michael J. Milne, Senior Deputy District Attorney, Brighton, Colorado, Attorneys for Plaintiff–Appellant.

Springer and Steinberg, P.C., Harvey Steinberg, Michael P. Zwiebel, Denver, Colorado, Attorneys for Defendant–Appellee.

Justice RICE delivered the Opinion of the Court.

In this interlocutory appeal taken pursuant to C.A.R. 4.1, we review an order from the

[Det. Poynter]: Well and I, I don't think anybody does. You know but unfortunately what happened tonight went from bad to worse and here we are ok. Um before we start talkin' to[o] much like I was tellin' you on the way up here um obviously you are in custody. Um for playing a role in what happened up earlier this morning so before we do talk I do have to read you Miranda just like I said ok. Have you ever been arrested before Lee?

[Madrid]: Yes I have sir.

[Det. Poynter]: For what?

[Madrid]: Just domestic.

[Det. Poynter]: Ok.

[Madrid]: (unintelligible) serious charges.

In all of the foregoing colloquy, Detective Poynter spoke softly, slowly, calmly, and without any agitation. When the victim's death was mentioned, Madrid began crying, but did not appear to lose control of himself.

Detective Poynter then proceeded to provide Madrid with the department's standard *Miranda* advisement form. At this point Madrid stopped crying and appeared to collect himself. Detective Poynter read the *Miranda* advisement to Madrid and asked him to initial by each advisement, and sign underneath if he understood the advisements. Madrid initialed each blank, and then signed at the bottom. Detective Poynter then read to Madrid the form's question asking if he was willing to discuss the case without a lawyer present. Madrid read that question on the form, following it with his pen, and wrote "yes" next to that question, adding his signature. Detective Poynter then proceeded to question Madrid about the shooting. By all indications, the entirety of Madrid's interview was audio- and video-recorded. That DVD recording is part of the record on appeal.

Madrid was charged with first degree murder, second degree burglary, and illegal discharge of a firearm. Madrid moved to suppress all of his statements to the police, arguing that his statements preceding the *Miranda* warning were inadmissible results of custodial interrogation, and that his *Miranda* waiver was coerced such that all subsequent statements were likewise inadmissi-

ble. The hearing on Madrid's motion was conducted based upon the DVD of Madrid's interview; Thornton police officers testified on other issues but that testimony added nothing to what is found in the DVD.

In an order from the bench, the trial court suppressed all of Madrid's statements to the police. As explanation, the trial court simply stated that Madrid's *Miranda* warning came too late; the court made no other findings of fact. Seeking clarification, the prosecutor asked if the *Miranda* warning was appropriate, and the trial court answered, "The *Miranda* warning complied with the standards for the *Miranda* warning, and the statement was voluntary." When the prosecutor asked if the court was ruling that Madrid was coerced into waiving his *Miranda* rights, the trial court answered "yes." The trial court then issued a written minute order stating that "Miranda warning was too late in time it should have been given much earlier, motion to suppress is granted"; no other written order was issued.

## II. Analysis

In their interlocutory appeal, the People request that we reverse the trial court's suppression of Madrid's statements. They argue that Madrid's statements before receiving the *Miranda* warning are admissible because they were not the product of custodial interrogation, and therefore no warning was required. They also argue that Madrid's statements after receiving a *Miranda* warning are admissible because Madrid's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. Madrid does not dispute that all of his statements were voluntary, but argues that his pre-*Miranda*-warning statements were the product of custodial interrogation, and his *Miranda* waiver was coerced. We agree with the People's analysis, and therefore reverse the trial court's suppression order.

### A. Standard of Review

■ Ordinarily, we defer to the trial court's factual determinations in suppression cases, provided they are supported by competent evidence in the record. *People v. Gennings*, 808 P.2d 839, 844 (Colo.1991).

However, "[w]hen the controlling facts are undisputed, the legal effect of those facts constitutes a question of law which is subject to *de novo* review." *People v. Valdez,* 969 P.2d 208, 211 (Colo.1998). Thus, where the statements sought to be suppressed are audio- and video-recorded, and there are no disputed facts outside the recording controlling the issue of suppression, we are in a similar position as the trial court to determine whether the statements should be suppressed. *See People v. Platt,* 81 P.3d 1060, 1067 (Colo.2004); *People v. Al-Yousif,* 49 P.3d 1165, 1171 (Colo.2002); *People v. Dracon,* 884 P.2d 712, 719 (Colo.1994).

Because Madrid's statements were audio- and video-recorded, because there are no disputed facts outside that record bearing on the issue of suppression, and because the trial court did not make detailed factual findings, we undertake an independent review of the facts of this case to determine whether Madrid's statements were properly suppressed in light of the controlling law.

### B. Madrid's Pre–*Miranda*–Warning Statements

■ We first analyze the admissibility of the statements Madrid made before his *Miranda* warning and waiver. Under *Miranda,* a suspect's statements resulting from custodial police interrogation are inadmissible in the prosecutor's case-in-chief unless the defendant is advised of and waives his right to remain silent, such that any statement he makes may be used against him, and his right to the presence of an attorney, either retained or appointed. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *People v. Howard,* 92 P.3d 445, 449 (Colo.2004). The parties do not dispute that Madrid was in police custody at the time he made all of the suppressed statements, but rather whether Madrid's pre-*Miranda*-warning statements were the product of interrogation.[1]

■ A suspect is interrogated, for purposes of determining whether *Miranda*

warnings are required, whenever the suspect "is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Thus, interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis,* 446 U.S. at 301, 100 S.Ct. 1682; *see People v. Gonzales,* 987 P.2d 239, 241 (Colo. 1999). In considering whether an officer should have known that his or her actions were reasonably likely to elicit an incriminating response, "we consider the totality of the circumstances surrounding the making of the statement." *Gonzales,* 987 P.2d at 241. We focus our inquiry on whether the officer reasonably should have known that his or her words or actions would cause the suspect to perceive that he or she was being interrogated, and whether those words or actions, like express questioning, could compel the defendant to overcome his or her desire to remain silent. *Id.* at 241–42.

We have had several occasions to analyze what constitutes "express questioning or its functional equivalent," though in general our cases have turned upon the trial court's particularized findings of fact, which are lacking here. On the one hand, we have held that where a suspect initiated a discussion asking about the charges filed against him and the officer truthfully answered, there was no interrogation for purposes of *Miranda. People v. Rivas,* 13 P.3d 315, 320 (Colo.2000). Likewise, where a suspect asked a police officer, "Can I be up front with you?" and the officer answered, "Sure," there was no interrogation. *Gonzales,* 987 P.2d at 242–43. In addition, we have held that allowing a suspect's wife to speak with him in the presence of the police, after the wife had learned her husband confessed to injuring their child, was not the functional equivalent of interrogation given the circumstances. *People v. Minjarez,* 81 P.3d 348, 357 (Colo.2003); *cf.*

---

1. As noted above, Madrid does not claim that his pre-*Miranda*-warning statements were involuntary, so we need not conduct that analysis. *See Valdez,* 969 P.2d at 211–13 (analyzing whether a defendant's statements were voluntary, regardless of whether a *Miranda* waiver was first obtained).

*Innis,* 446 U.S. at 303, 100 S.Ct. 1682 (holding that officers' conversation amongst themselves, with the suspect in the car, about concerns of disabled children finding the weapon used in the crime was not the functional equivalent of interrogation because there was no evidence the conversation was specifically designed to prey on the suspect's sympathies in this regard).

On the other hand, we have also deferred to a trial court's specific findings of an intent to elicit incriminating responses. For instance, we have affirmed a finding of interrogation in a case where officers told the suspect that the purpose of the interview was "to get both sides" and encouraged the suspect to tell his side of the story while he was in a harried emotional state, *People v. Wood,* 135 P.3d 744, 750–51 (Colo.2006), and in a case where an officer, with his gun drawn on the suspect, asked who the suspect was, what he was doing, and why he was hiding, and then accused the suspect of lying. *People v. Breidenbach,* 875 P.2d 879, 887 (Colo.1994).

■ This brings us to the case at hand, which presents us with a close question as to whether Madrid was subjected to interrogation before receiving a *Miranda* warning. We agree with the trial court that, as a practical matter, a *Miranda* warning should have been provided earlier to prevent this type of issue from arising. There is no apparent reason why a *Miranda* warning could not have been provided at the beginning of the custodial interview, before anything else was said; certainly that would have been a better practice. Nevertheless, we find that given the specific facts before us, as evidenced by the DVD recording, Madrid was not subjected to interrogation before receiving his *Miranda* warning.

Except for asking if Madrid had been arrested before—a question directly antecedent to the administration of the *Miranda* warning, relevant to Madrid's ability to understand the warning,[2] and unlikely to elicit an incriminating response—Detective Poynter did not ask Madrid any questions. Thus, the only issue is whether Detective Poynter's statements were the functional equivalent of direct questioning, in that he should have known they were reasonably likely to elicit an incriminating response from Madrid and could compel Madrid to overcome his desire to remain silent. *See Gonzales,* 987 P.2d at 241–42.

Our review of the recording of Detective Poynter's statements convinces us that his pre-*Miranda*-warning statements were not intended to elicit an incriminating response, should not have been recognized as likely to elicit an incriminating response, and did not in fact elicit an incriminating response. Though coming very close to being the functional equivalent of direct questioning, Detective Poynter's statements instead appear to be an explanation of why Madrid was being interviewed. Furthermore, the exchange was initiated by Madrid, and his interjections during Detective Poynter's statements appear to be spontaneous interruptions, rather than responses to express questioning or its equivalent. Certainly, Detective Poynter did not employ any of the equivalents of express questioning mentioned in *Innis,* such as to " 'posi[t]' 'the guilt of the subject,' to 'minimize the moral seriousness of the offense,' and 'to cast blame on the victim or on society.' " *Innis,* 446 U.S. at 299, 100 S.Ct. 1682 (quoting *Miranda,* 384 U.S. at 450, 86 S.Ct. 1602).

We thus find that given the totality of the circumstances, Madrid's pre-*Miranda*-warning statements were volunteered, and were not the product of interrogation. *See Gonzales,* 987 P.2d at 241 ("It is clear ... that the Fifth Amendment and *Miranda* do not prohibit the evidentiary use of volunteered, non-compelled statements made by a suspect in the absence of counsel."). Accordingly, those statements are admissible because a *Miranda* warning and waiver were not required.

### C. Madrid's Post-*Miranda*-Warning Statements

We next turn to the question of whether Madrid's statements following his *Miranda*

2. *See People v. Humphrey,* 132 P.3d 352, 356 (Colo.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 227, 166 L.Ed.2d 146 (2006) (suspect's background and experience in connection with the criminal justice system is a factor in analyzing whether suspect is able to understand and knowingly waive *Miranda* rights).

warning and waiver are admissible. The trial court found that those statements were voluntary, and Madrid does not challenge that finding. Instead, Madrid argues that his *Miranda* waiver was coerced, as the trial court apparently concluded. Again, because this analysis turns solely upon the audio- and video-taped interview that is part of the record, we are in a similar position as the trial court in determining whether Madrid's waiver was valid. Upon our independent review of the facts, we determine that Madrid's *Miranda* waiver was not coerced, and therefore his post-*Miranda*-warning statements are admissible.

■ "The validity of a defendant's waiver turns upon two elements: (1) voluntariness, that is, whether the waiver 'was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and (2) knowing and intelligent action, that is, whether the defendant was fully aware 'both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Humphrey,* 132 P.3d at 356 (quoting *People v. May,* 859 P.2d 879, 882–83 (Colo. 1993)). In addressing these two elements we look at the totality of the circumstances. *Id.*

■ Madrid does not dispute that his *Miranda* waiver was knowing and intelligent; he only disputes that it was voluntary. In assessing whether Madrid's waiver of his *Miranda* rights was voluntary, "the sole concern ... is the presence or absence of government coercion." *Humphrey,* 132 P.3d at 357; *see Colorado v. Connelly,* 479 U.S. 157, 170, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The prosecution bears the burden of showing by a preponderance of the evidence that the suspect's waiver was voluntary. *Humphrey,* 132 P.3d at 357. The trial court did not make any findings as to how Madrid was purportedly coerced into waiving his *Miranda* rights, but Madrid argues that the coercion consisted of Detective Poynter implying that giving a statement was in Madrid's family's best interest, falsely asserting that the police already knew what had happened, and offering Madrid a way to minimize his culpability by claiming the incident was a "mistake." Madrid claims that given his harried emotional condition, these tactics lured him into believing that remaining silent could only harm him and that providing a statement was the only way to establish an excuse.

We find no evidence in the record establishing that Madrid's waiver of his *Miranda* rights was the product of "intimidation, coercion, or deception," rather than a free and deliberate choice. *See id.* at 356; *see also People v. Pease,* 934 P.2d 1374, 1379 (Colo. 1997) (finding no evidence that the police used "affirmative misrepresentations to break down a defendant's will" and force him to waive his rights). Though it would have been a better practice for Detective Poynter to have refrained from prefacing his *Miranda* warnings with his comments, we cannot say that he affirmatively misrepresented any facts, sought to minimize Madrid's culpability, or otherwise coerced Madrid into waiving his *Miranda* rights. Detective Poynter spoke slowly, calmly, and without any apparent effect of intimidating or deceiving Madrid.

We find this case to be most analogous to *Humphrey,* where we held that the police officer's suggestion that the purpose of the interrogation was to get the defendant's side of story was not so misleading as to constitute the kind of intimidation, misconduct, or trickery that would invalidate the defendant's *Miranda* waiver. *See* 132 P.3d at 357. Though Madrid claims he was in a weakened mental state when asked to waive his *Miranda* rights, the record instead reveals that Madrid had collected himself by the time he received his *Miranda* warnings. Indeed, Madrid can be seen tracking portions of the *Miranda* waiver language with his pen as Detective Poynter read its text to him, before Madrid calmly agreed to the waiver by writing "yes" and signing his name.

Accordingly, we find that Madrid's waiver of his *Miranda* rights was not coerced. Because Madrid does not dispute that his waiver was knowing and intelligent, we find that he validly waived his *Miranda* rights and his subsequent statements are therefore admissible.

## III. Conclusion

We conclude that all of Madrid's statements to the police were admissible. Accordingly, we reverse the trial court's suppression order, and remand for further proceedings consistent with this opinion.

Justice MARTINEZ dissents in part and concurs in the judgment only in part, and Chief Justice MULLARKEY and Justice BENDER join with Justice MARTINEZ.

Justice MARTINEZ, dissenting in part and concurring in judgment only in part:

In contrast to the majority's holding in part B of its opinion, I would hold that the police subjected Madrid to custodial interrogation without the benefit of *Miranda* warnings, and that consequently Madrid's pre-*Miranda* statements should be suppressed. Therefore, I respectfully dissent from part B of the majority opinion.

However, I do agree with the majority's holding that Madrid's post-*Miranda* statements are admissible. I write separately because I believe the analysis of this issue requires attention to the holdings of *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).

### I. Pre-*Miranda* Statements

In the absence of *Miranda* warnings, a defendant's statements made during the course of a custodial police interrogation are inadmissible as evidence in the prosecutor's case-in-chief. *People v. Wood*, 135 P.3d 744, 749 (Colo.2006). The U.S. Supreme Court has defined interrogation as "*any words* or actions on the part of the police (other than those normally attendant to arrest and custody) *that the police should know are reasonably likely to elicit an incriminating response* from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (emphasis added). Thus, interrogation can consist of direct questioning or its "functional equivalent." *Id.* Examples of the functional equivalent of direct questioning include psychological ploys such as positing the guilt of the suspect, minimizing the moral seriousness of the offense, or casting blame on the victim or society. *Id.* at 299, 100 S.Ct. 1682 (quoting *Miranda v. Arizona*, 384 U.S. 436, 450, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

To determine if an officer should have known that his or her actions were reasonably likely to elicit an incriminating response, this court considers the totality of the circumstances. *Wood*, 135 P.3d at 750. "We focus our inquiry on whether the officer reasonably should have known that his words or actions would cause the suspect to perceive that he was being interrogated." *Id.* (quoting *People v. Gonzales*, 987 P.2d 239, 241 (Colo.1999)).

This court's decision in *Wood* is instructive on the question of whether Madrid was subjected to interrogation without the benefit of *Miranda* warnings. There, prior to giving the *Miranda* warnings, the police detective repeatedly told the defendant that the purpose of the interview was "to get both sides" and encouraged the defendant to tell his side of the story. *Id.* at 750–51. We noted that this was "particularly problematic" in light of the fact that the detective was well aware that the defendant was under arrest and was a suspect in a homicide investigation. *Id.* at 751. We also found that the defendant's custody, combined with the defendant's "harried emotional state" upon learning of the victim's death, was relevant to whether the defendant would have reasonably perceived that he was being interrogated. Id. Indeed, these circumstances "set the stage for [the detective] to invite comments without formally asking questions." *Id.* Thus, we concluded that under the circumstances, the detective's "relationship-building" efforts and suggestions that the defendant tell "his side of the story" were reasonably likely to elicit an incriminating response and that the detective should have known that his words and actions were likely to do so. *Id.* at 751–52.

Here, this court is presented with remarkably similar relationship-building efforts and suggestions that would encourage Madrid to tell the detective why events unfolded as they did. The detective begins the interview by stating that Madrid needs to be thinking about his family and kids, which suggests to

Madrid that his family would be best served by Madrid's willingness to be forthcoming with information. Next, the detective indicates that he already knows what happened that night, which advises Madrid that he is free to tell his story because the police already know the truth. The detective continues by suggesting a possible defense or a means by which Madrid could minimize his involvement in the incident by stating that he knows what happened that night "was probably not planned, probably was a mistake even." Then, after these relationship-building efforts, the detective reveals the seriousness of the incident, noting that a man is dead. Madrid begins to cry and responds with several statements regarding this news. The detective acknowledges that the interrogation has already commenced at this point, stating that "before we start talkin' to[o] much ... I have to read you Miranda." The detective's statements effectively trivialize the importance of the *Miranda* warnings, describing them as just something the detective has to read before they continue talking. Finally, the detective again minimizes Madrid's possible involvement, stating that Madrid was in custody for "playing a role in what happened."

Looking to the totality of the circumstances, the detective should have known that his statements were reasonably likely to elicit an incriminating response from Madrid, thereby overcoming any desire Madrid may have had to remain silent. The detective's statements invited Madrid to comment by advising him of the benefits of being truthful, minimizing Madrid's own involvement, suggesting a possible defense, emphasizing the seriousness of the offense, and minimizing the importance of the *Miranda* rights. When these statements are viewed in conjunction with Madrid's emotionally distraught state and the detective's awareness that Madrid was a suspect in a homicide investigation, it is clear that the detective's words and actions constituted interrogation. Because the facts here so closely parallel the facts in *Wood,* I cannot conclude otherwise.

Furthermore, this conclusion is supported by the finding of the trial court concerning the timing of the *Miranda* warnings. By noting that the *Miranda* warnings came "too late" and that they "should have been given much earlier," the trial court found that Madrid was subjected to custodial interrogation by the police prior to the giving of the *Miranda* warnings. In the context of a suppression motion, the trial court's findings of historical fact are entitled to deference by a reviewing court. *See Wood,* 135 P.3d at 751; *see also People v. Rivas,* 13 P.3d 315, 320 (Colo.2000). Thus, because the trial court's conclusion that the *Miranda* warnings came "too late" is supported by the record, Madrid's pre-*Miranda* statements must be suppressed.

## II. Post-*Miranda* Statements

Having determined that Madrid was subjected to interrogation prior to the reading of *Miranda* warnings, I turn to the admissibility of Madrid's post-*Miranda* statements. The trial court excluded Madrid's post-*Miranda* statements because the *Miranda* warnings came "too late in time" and "should have been given much sooner." When the prosecution sought clarification, asking if the court's ruling was that the *Miranda* waiver was coerced, the trial court stated "yes." Consequently, the parties have focused their arguments on whether Madrid's waiver was coerced.

However, based on the facts of this case, the appropriate question to consider is the *effectiveness* of Madrid's *Miranda* waiver following the detective's comments, which suggested a possible defense, minimized the importance of the *Miranda* rights, indicated that the police already knew what had happened, and implied that providing a statement was in Madrid's family's best interest. When a warned interrogation is preceded by an unwarned phase of interrogation, the effectiveness of the mid-interrogation *Miranda* warnings is governed by *Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222, and *Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643. The law on this issue is far from settled; indeed, *Elstad* and *Seibert* present three possible tests to determine the admissibility of post-*Miranda* statements that were preceded by a prior unwarned interrogation.

I would not resolve today the question of which test should apply to the facts before us because, by any test, Madrid's post-*Miranda* statements are admissible. However, unlike the majority, which has not considered this question, I believe a proper analysis of Madrid's post-*Miranda* statements requires attention to the law as set forth in *Elstad* and *Seibert.*

In *Elstad,* the defendant made incriminating statements when officers questioned him in his home regarding his involvement in a burglary without first advising him of his *Miranda* rights. 470 U.S. at 300–01, 105 S.Ct. 1285. After the defendant was taken into the police station, and after he was advised of and waived his *Miranda* rights, the defendant wrote and signed a complete confession. *Id.* at 301–02, 105 S.Ct. 1285. The U.S. Supreme Court held that the written confession was admissible in spite of the inadmissibility of the previous unwarned statements. Id. at 318, 105 S.Ct. 1285. The Court reasoned that "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.* at 309, 105 S.Ct. 1285. Thus, under *Elstad,* the admissibility of post-*Miranda* statements that were preceded by a prior unwarned interrogation depends entirely on whether the later statements were made knowingly and voluntarily. *See id.*

The Court revisited this issue in *Seibert,* where it considered a police protocol for custodial interrogation that called for giving no *Miranda* warnings until the interrogation produced a confession. 542 U.S. at 604, 124 S.Ct. 2601. After a confession, the police would give the *Miranda* warnings and continue questioning until the interrogation elicited the same confession again. *Id.* The Court distinguished *Elstad,* and held that the post-*Miranda* confession must be suppressed on the basis that the *Miranda* warnings were made ineffective by the two-step interrogation process. *Id.* at 614–17, 621–22, 124 S.Ct. 2601.

The opinion in *Seibert,* however, was split. The plurality, which was joined by four of the justices, held that "[t]he threshold issue when interrogators question first and warn later is . . . whether it would be reasonable to find that in these circumstances the warning could function 'effectively' as *Miranda* requires." *Id.* at 611–12, 124 S.Ct. 2601. Thus, if the circumstances "challeng[ed] the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk," the post-warning statements are inadmissible. *Id.* at 617, 124 S.Ct. 2601. The plurality offered several "relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object":

> [1] The completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615, 124 S.Ct. 2601. Thus, the plurality's test involves an objective inquiry from the perspective of the defendant and would apply to both intentional and unintentional two-stage interrogations.

Justice Kennedy concurred in the judgment on what he termed "narrower" grounds. *Id.* at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment). He concluded that "[t]he admissibility of post-warning statements should continue to be governed by the principles of *Elstad* unless the *deliberate* two-step strategy was employed." *Id.* (Kennedy, J., concurring in the judgment) (emphasis added). In such circumstances, postwarning statements "must be excluded absent specific, curative steps," such as a break in time or other circumstances between the prewarning statement and the *Miranda* warnings. *Id.* at 621, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment). Thus, Justice Kennedy's approach attempts to redirect the Court's inquiry to the intent of the interrogating officer.

Here, as determined in section I of this dissent, we are presented with a period of unwarned interrogation followed by *Miranda* warnings and then continued interrogation. However, the record does not reveal that the police detectives intended that this two-step interrogation process undermine the effectiveness of the *Miranda* warning. Indeed, at the suppression hearing, one of the detectives denied that they were trying to soften up the defendant or be friendly in order to induce a waiver. Thus, under Justice Kennedy's intent-focused test, the *Seibert* holding does not apply to Madrid's post-*Miranda* statements because they were not the product of a "deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview." *Id.* (Kennedy, J., concurring in the judgment).

Although a closer call, neither are Madrid's post-*Miranda* statements inadmissible under the plurality's test in *Seibert*. In contrast to Justice Kennedy's approach, Madrid need not demonstrate a deliberate strategy by the police to undermine the *Miranda* warnings. However, the plurality's approach focuses largely on the relationship between the first and second phases of the interrogation. *See id.* at 614–17, 124 S.Ct. 2601 (explaining that "relevant facts" to determine effectiveness of *Miranda* warnings include: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, . . . and the degree to which the interrogator's questions treated the second round as continuous with the first"). Specifically, the plurality's analysis indicates that a major consideration of the *Miranda* warnings' effectiveness is the degree to which inculpatory statements made during the unwarned phase of the interrogation affect the defendant's belief that he retained a choice about continuing to talk during the second warned phase. *See id.* at 616–17, 124 S.Ct. 2601.

Here, the detective did not ask any direct questions during the pre-*Miranda* phase of the interrogation about the crimes Madrid allegedly committed. Nor did Madrid make any specific inculpatory statements in response to the detective's comments. Thus,

there was no overlapping content between Madrid's non-inculpatory statements during the first interrogation and his inculpatory statements during the second interrogation. Rather, the danger of the detective's statements during the first unwarned interrogation lay in their ability to lock Madrid into his pre-*Miranda*-warnings decision to provide a statement. The detective's comments, which suggested a possible defense, minimized the importance of the *Miranda* rights, indicated that the police already knew what had happened, and implied that providing a statement was in Madrid's family's best interest, undermined the impact of the *Miranda* warnings when they were finally given. Although the detective's conduct implicates *Seibert's* underlying concern that police tactics not "drain the substance out of *Miranda*," *Seibert's* predominant focus on statements made during the first unwarned interrogation precludes a finding that Madrid's post-*Miranda* statements must be suppressed. *See id.* at 617, 124 S.Ct. 2601.

If *Seibert* does not apply to Madrid's post-*Miranda* statements under either the plurality or Justice Kennedy's tests, Madrid's statements are governed by the test set forth in *Elstad*. *See Elstad*, 470 U.S. at 309, 105 S.Ct. 1285 ("Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."). Although not in the context of *Elstad*, the majority has addressed voluntariness in part C of its opinion, and I agree that Madrid's post-*Miranda* statements were made voluntarily.

In sum, without resolving which test is applicable to the admissibility of Madrid's post-*Miranda* statements, I would hold that the statements are admissible.

## III.

Because I would affirm the trial court's decision to suppress Madrid's pre-*Miranda* statements, I respectfully dissent from part B of the majority opinion. However, I concur with the majority's judgment that Ma-

drid's post-*Miranda* statements are admissible.

I am authorized to state that CHIEF JUSTICE· MULLARKEY and JUSTICE BENDER join in this dissent and concurrence.