22CA0900 Peo v Jackson 07-31-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA0900
Pueblo County District Court No. 20CR299
Honorable Deborah R. Eyler, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Rashad Jackson,

Defendant-Appellant.

---

JUDGMENT AFFIRMED AND ORDER REVERSED

Division VII
Opinion by JUSTICE MARTINEZ*
Pawar and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 31, 2025

---

Philip J. Weiser, Attorney General, Grant R. Fevurly, Senior Assistant Attorney General, Ashley Carter, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Lisa Weisz, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Defendant, Rashad Jackson, appeals the judgment of conviction entered on a jury verdict finding him guilty of manslaughter. He asserts three trial errors and contests the court's order that he pay the costs of prosecution. We affirm the judgment of conviction and reverse the order granting the prosecution's motion for costs.

## I.     Background

¶ 2     The prosecution charged Jackson with second degree murder after his wife, G.J., died from injuries that she sustained during a domestic dispute between them.

¶ 3     A reasonable juror could have found, based on the evidence introduced at trial, that Jackson had a history of hitting the victim. In the weeks before the incident, Jackson and the victim were evicted from their home and began residing with their two young children in an abandoned house that lacked heating, electricity, and running water.

¶ 4     Jackson told detectives that on the night in question, he and the victim got into an argument. Jackson slapped the victim in the face, causing her to fall backward and hit her head on a sheet-metal radiator cover. According to Jackson, the couple continued

1

arguing and hitting one another, although they eventually stopped because each of them were showing "symptoms of a concussion." They reconciled and went to bed. When Jackson woke up the next morning, he found the victim unresponsive. After performing CPR, Jackson concluded that she had died in her sleep.

¶ 5    That afternoon, neighbors' surveillance videos showed Jackson wheeling the victim's body into a nearby alley on a stroller, and later, returning to drag it into plain view so that someone would find it. A few hours later, after nobody else had discovered the body, Jackson called 911 himself. He was taken to the police station, where he later admitted to striking the blow that caused the victim to fall and hit her head.

¶ 6    At trial, a forensic pathologist testified that he found significant bleeding and swelling in and around the victim's brain and that the cause of death was "blunt force head trauma." While he was not able to determine an exact time of death, he testified that Jackson's version of events was certainly possible.

¶ 7    Jackson's defense theory was that he did not knowingly cause the victim's death. If anything, his actions "recklessly caused the death of [the victim]." Defense counsel asked the jury to acquit

2

Jackson of second degree murder and instead convict him of the crime that "he actually committed": the lesser included offense of manslaughter.

¶ 8 The jury acquitted Jackson of second degree murder and found him guilty of manslaughter. The court sentenced him to six years in the custody of the Department of Corrections.

¶ 9 Jackson raises four claims on appeal: (1) his station house admissions were coerced, and thus, inadmissible; (2) evidence of his prior acts of domestic violence was inadmissible; (3) the prosecutor committed misconduct during closing argument; and (4) the court improperly ordered costs of prosecution.

## II. Jackson's Admissions

¶ 10 Jackson first claims that the station house interrogation in which he admitted to hitting the victim was unduly coercive, and as such, any admissions he made were involuntary. We disagree.

### A. Additional Background

¶ 11 Jackson moved to suppress his admissions before trial. The court held a hearing on the motion and watched a complete video of the interview.

¶ 12     The video began with Jackson sitting in an interview room with his children for approximately an hour. Two detectives in plainclothes entered the room, took the children to a different room, and then engaged Jackson in small talk. After a few minutes, the lead detective transitioned the conversation to Jackson's *Miranda* rights:

> Hey man, we wanna talk to you about all this nonsense going on tonight man. We wanna make sure we don't violate any kind of rights or anything like that, so I just wanna go through your constitutional rights. . . . This is just because we're at a police station, we're in an interview room, and just wanna make sure that we're not violating anybody's rights or anything like that, is that good? Right on, man.

The lead detective read Jackson his rights, and Jackson signed the *Miranda* waiver and agreed to speak with the detectives.

¶ 13     The detectives asked Jackson what happened, and he said that the victim left in the night to get milk for one of the children and did not return. He said that while looking for the victim the next day, he discovered what he believed was a body in the alley and called 911. This portion of the interview lasted approximately an hour, and the tone was largely narrative and conversational,

4

although the detectives occasionally asked specific follow-up questions.

¶ 14 The detectives then told Jackson that they would take a break. One detective told Jackson that if he needed to use the restroom, there was one across from the interview room. Jackson asked, "I can step out?" The detective answered, "Yeah, if you need to use the bathroom. And then we'll get your kids, and we'll try to finish up here doing what we're doing and move on." Jackson did not get up to use the restroom, however, until the detectives returned.

¶ 15 After the break, the detectives confronted Jackson with surveillance video of him in the alley earlier in the day. They said, "Now's not the time to hold anything back, man," and "It's okay to tell me the truth." Jackson modified his initial account but maintained that the victim did not return home and that he merely found her body in the alley earlier in the day and moved it to a different location using the stroller.

¶ 16 The lead detective then made three attempts to elicit the truth from Jackson. First, the detective said,

> From what we're being told from our investigators, this happened inside the house. Tell us about it. The only way to try to help

you out is to know exactly what happened. . . . This is the only way I know how to help you is by being able to tell the truth and being exactly able to tell my bosses what happened to her. I can go to bat for you man. . . . There's nothing in the world you can tell me right now to where I will judge you, make you sound like a bad person, threaten you, take your kids away and everything, no. Because every single one of us . . . have made mistakes before. There ain't a perfect human being anywhere in this world. If something happened, which we know it did, now is the time to tell us about it.

Jackson maintained his modified version of events.

¶ 17    Second, the detective asked Jackson whether the incident was an accident. Jackson said, "[N]othing was intentional," and then told the detectives that the victim had fallen inside their house and hit her head on the radiator cover.

¶ 18    Third, the detective said,

What you're telling me is an accident, okay? But I need to know the truth from you. Because what doesn't lie is evidence. And the hard part about us going to bat for you is if we're not being told the whole entire truth and then we go and see the evidence and it tells something different bro, buddy? You have no dog in the fight at that point, man. I just got done telling you there ain't a perfect human being in this world. Everybody fights, everybody gets pissed off. It's as old as time itself, males and females fighting, relationships, things happen. . . . You being a

6

veteran, you being in the circumstances that
you are right now, things can happen man.
And if things happened like that, we can
understand that.  What we can't understand is
when somebody comes in here and starts
telling some stories that just aren't matching
up with the evidence.  That's hard to
understand and it's hard to go to bat for
somebody when we're being told something
different than what the evidence shows.
You're a good dude, man.  Just because
something happens doesn't mean you're the
worst fricking person in this damn world.  Not
at all man.  I know cops, people can talk all
the crap they want about cops just trying to
hurt you or trying to lock you up.  I don't . . .
want to do that, man.  I hate that.  But what I
need from you, Rashad, straight up man to
man, human being to human being, not police
officer to citizen, . . . we need to know the
truth.  That's the only thing that sets us free,
man.

At that point, Jackson admitted that the victim fell into the radiator

cover because he slapped her.  He explained in detail how they

fought, how he found her in the morning, and how he moved her

body to a location where he hoped someone else would find it.

¶ 19      The detective asked Jackson whether he was "injured" and

whether he was "okay."  Jackson became emotional about the loss

of his wife.  The detective asked, "What do you think caused her to

pass away?"  Jackson answered, "I think she had a concussion and

went to sleep with a concussion and needed medical attention." Jackson added, for the first time in the interrogation, that they *both* had concussion symptoms that night, which is why they stopped fighting.

¶ 20      This portion of the interview lasted approximately seventy-five minutes, and the lead detective's tone vacillated.  At times he was friendly and sympathetic, and at other points he was more direct and confrontational.  The detective's tone was never threatening or disrespectful, however.  By the end of the interview, the detectives had spoken with Jackson for approximately two and a half hours, although he had been sitting in the interview room for closer to four hours.

¶ 21      At the conclusion of the interview, the detectives asked Jackson for consent to take biological samples and show them the abandoned house.  He agreed to both requests.  Jackson asked if he was "going to jail," and one detective advised him that he was under arrest for second degree murder.

¶ 22      In a written order, the court found that Jackson's statements were voluntary:

> During the interview there was no overt or implied threat or promise. There was nothing coercive about the interview itself. Statements made by the Defendant during the interview appeared to be made voluntarily and knowingly. There was nothing about the Defendant's conduct before or during the interview to suggest that his physical or mental condition was impaired such that his statements were not voluntary.

The court denied Jackson's motion to suppress. In its order, the court assumed without deciding that Jackson was in custody "once he was in the interview room with detectives."

¶ 23    At trial, the prosecutor introduced the video of Jackson's interview and referenced his admissions during closing argument.

### B.    Applicable Law and Standard of Review

¶ 24    The United States and Colorado Constitutions guarantee the privilege against self-incrimination. U.S. Const. amends. V, XIV; Colo. Const. art. II, § 18. If an individual gives incriminating statements, the Fifth and Fourteenth Amendments require the statements to be made voluntarily to be admitted into evidence. *People v. Sanders*, 2023 CO 62, ¶ 11. To be voluntary, a statement must be the product of an essentially free and unconstrained choice and cannot be the product of coercive government conduct that

9

actually overbore the suspect's will. *Id.* at ¶ 14. "Coercive police conduct includes not only physical abuse or threats directed against a person, but also subtle forms of psychological coercion." *Effland v. People*, 240 P.3d 868, 877 (Colo. 2010).

¶ 25 "[D]etermining whether the safeguards established in *Miranda v. Arizona*, 384 U.S. 436 (1966), apply and were followed and determining whether a statement was voluntary are different analyses, even though the relevant legal considerations are intertwined." *People v. Nkongolo*, 2025 CO 20, ¶ 15. To determine whether a defendant's statements were voluntary, we consider the totality of the circumstances, with the help of "[a] thorough but non-exhaustive list of factors — which overlaps with but does not duplicate the *Miranda* custody determination factors." *Sanders*, ¶ 14. Those factors are

    (1)   whether the defendant was in custody or was free to leave and was aware of his situation;

    (2)   whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived his *Miranda* rights;

(3)   whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation;

(4)   whether the challenged statement was made during the course of an interrogation or instead was volunteered;

(5)   whether any overt or implied threat or promise was directed to the defendant;

(6)   the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and

(7)   the defendant's mental and physical condition immediately prior to and during the interrogation, as well as his educational background, employment status, and prior experience with law enforcement and the criminal justice system.

*Id.* (quoting *People v. Gennings*, 808 P.2d 839, 844 (Colo. 1991)).[1]

---

[1] In recent years, the Colorado Supreme Court has recited different variations of this test, although the differences largely come down to whether the factors are grouped thematically or broken apart. *Compare People v. Sanders*, 2023 CO 62, ¶ 14, *with People v. Nkongolo*, 2025 CO 20, ¶ 18. We recite the factors according to *Sanders*, simply to correspond with the parties' arguments in their briefs.

¶ 26    Weighing the voluntariness factors is "not quantitative"; "we do not simply count the number of factors on each side of the equation and see which side has more." *Cardman v. People*, 2019 CO 73, ¶ 27. We do not give the same weight to each factor, and how much weight we give each factor depends on the circumstances involved. *Id.*

¶ 27    Whether a defendant's confession was involuntary is a mixed question of law and fact. *Sanders*, ¶ 10. We defer to the trial court's factual findings regarding the circumstances surrounding the confession, but we consider de novo whether those circumstances rendered the defendant's statements involuntary. *Nkongolo*, ¶ 13. "[W]here the statements sought to be suppressed are audio- and video-recorded, and there are no disputed facts outside the recording controlling the issue of suppression, we are in a similar position as the trial court to determine whether the statements should be suppressed." *People v. Madrid,* 179 P.3d 1010, 1014 (Colo. 2008). Thus, the legal effect of undisputed controlling facts constitutes a question of law which is subject to de novo review. *Id.*

## C.    Application

¶ 28    First, we conclude that Jackson was in custody and was aware of his situation.  A suspect is in custody when "a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest." *People v. Davis*, 2019 CO 84, ¶ 17 (quoting *People v. Hankins*, 201 P.3d 1215, 1218 (Colo. 2009)).  Jackson was brought by police officers into a police-dominated atmosphere after reporting a dead body, was questioned for several hours with increasing specificity and intensity, was confronted with inculpatory evidence, and was never advised that he was free to terminate the encounter.  *See People v. Matheny*, 46 P.3d 453, 467 (Colo. 2002).  Jackson expressed surprise while confirming that he was allowed to leave the interview room to use the restroom, suggesting that, up to that point, he believed he was not free to leave.  *See id.*; *Effland*, 240 P.3d at 876.

¶ 29    Second, the detectives advised Jackson of his *Miranda* rights both verbally and in writing before asking him questions about the case.  Jackson waived his *Miranda* rights and agreed to talk to the detectives.  Defense counsel does not contend on appeal that

13

Jackson's waiver was involuntary. *See People v. Smiley*, 2023 CO 36, ¶¶ 26-27. We are not persuaded by Jackson's argument that the detective's use of the phrase "nonsense" downplayed the significance of the *Miranda* warning. In context, the statement was transitional, moving the conversation from small talk to the reason they were there. The detective did not, at any point, suggest that the warning was a mere formality.

¶ 30 Third, Jackson was advised of his right to confer with counsel before the interview. He did not invoke that right. *See People v. Cisneros*, 2014 COA 49, ¶ 85 (concluding that a defendant's statements were voluntary, in part, because "he did not ask to . . . speak with counsel, even after he was informed orally and in writing, through his *Miranda* advisement, that he had the right to do so"). The detectives did not undermine his rights or otherwise prevent him from conferring with counsel. *Cf. Effland*, 240 P.3d at 878 ("Of particular significance" in holding that the defendant's statements were involuntary was "the investigating officers' continued questioning" after the defendant invoked his rights to remain silent and confer with counsel.).

¶ 31     Fourth, the parties agree that Jackson made the challenged statements during an interrogation.

¶ 32     Fifth, we conclude that the lead detective's three attempts to get Jackson to tell the truth did not amount to the type of threats or promises that constitute a due process violation.  *See People v. Zadran*, 2013 CO 69M, ¶¶ 15-16 (concluding that the statement "I think it would be in your best interest to talk to me," among others, was not coercive); *see also People v. Theander*, 2013 CO 15, ¶¶ 44-46 (concluding that psychological coercion must play a "significant role" in inducing the confession and collecting cases involving the type of coercive conduct that overbore the defendant's will).  The detective did not make explicit "if-then" statements linking Jackson's choice to tell the truth to a specific consequence.  *See Cardman*, ¶¶ 28-29, 32 (confession involuntary where detective said he could put the case "in a drawer" and make it "go away" if the defendant met the victim halfway and admitted to some "inappropriate sexual stuff"); *People v. Ramadon*, 2013 CO 68, ¶¶ 23-25 (confession involuntary where detective said, among other things, "If you don't tell me the truth of what happened, then you're getting locked up"); *People v. Medina*, 25 P.3d 1216, 1225-26 (Colo.

15

2001) (confession involuntary where detective threatened to take the defendant's child away from the child's mother if the defendant did not cooperate).

¶ 33    Further, any implied threats or promises were overshadowed by at least two other strategies that much more directly contributed to Jackson's ultimate confession. *See Theander*, ¶ 45 ("Even if psychological coercion took place in this case, however, the court must find that the coercion played a 'significant role' in inducing the statements in order to exclude them.") (citation omitted). First, the detective asked whether the victim's death was an accident. In response, Jackson said, "[N]othing was intentional," marking a significant departure from his initial report. Second, the detective tried to minimize Jackson's shame about the nature of the offense by saying, "Everybody fights, everybody gets pissed off. It's as old as time itself, males and females fighting, relationships, things happen." Jackson's first response, after the detective's final entreaty, was that he was raised to believe a man had the "right" to hit a woman.

¶ 34    We are not persuaded that the detective's reference to Jackson's veteran status exploited a vulnerability. *Cf. Ramadon,*

¶¶ 24-25 (using the defendant's fear of death if he was deported to his home country to elicit inculpatory statements). In context, the detective merely identified Jackson's veteran status as an honorable and redeeming quality.

¶ 35     Sixth, we do not perceive anything inherently coercive about the interview's method, style, or length — apart from the fact that it took place at a police station. The interview involved two plainclothes detectives interviewing Jackson in a closed-door interrogation room. The detectives interviewed Jackson for approximately two and a half hours while maintaining a calm and respectful demeanor. They offered Jackson breaks, refreshments, and time with his children at various points throughout the evening.

¶ 36     Seventh, we are not persuaded that anything about Jackson's condition or background rendered the interview involuntary. At the time of the interview, Jackson was a young adult without significant prior experience with law enforcement. He had some college education, military experience, and was unemployed. During the interview, Jackson revealed that he had been diagnosed with mental health conditions after serving in the military. The

detectives learned, after he confessed, that he had experienced concussion symptoms the night before the interview. But the trial court found that there was "nothing" about Jackson's conduct "before or during the interview to suggest that his physical or mental condition was impaired such that his statements were not voluntary." The record supports the court's finding. Despite his mental health conditions and possible concussion symptoms, Jackson answered the detectives' questions logically and appropriately throughout the interview. He did not appear confused or indicate that he did not understand what he was being asked. He was not overly emotional or otherwise unable to participate in the interview.

¶ 37 On balance, we conclude that Jackson's confession was not coerced. True, Jackson was in custody and subjected to several interrogation techniques. But Jackson was thoroughly warned of his *Miranda* rights, and the detectives at no point undermined those rights. Although some of the lead detective's remarks, in a vacuum, could be construed as gently implied reassurances, the statements, in context, pale in comparison to similar cases in which appellate

courts have concluded that a detective's conduct was coercive. Thus, the court did not err by admitting Jackson's admissions.

### III.    Other Act Evidence

¶ 38    Jackson next contends that the court erred by admitting evidence that Jackson had committed prior acts of domestic violence against the victim under CRE 404(b). Alternatively, Jackson argues that the court's limiting instruction was flawed. We disagree.

### A.    Additional Background

¶ 39    Before trial, the prosecution filed a notice of intent to introduce other act evidence under CRE 404(b). At a pretrial hearing, the prosecution proffered testimony from the victim's child care provider and coworker, who both observed injuries on the victim at various points before her death. The child care provider testified that she noticed the victim had a black eye and a swollen lip approximately five months before her death. She also testified that once, while picking up the children from the couple's house, Jackson instructed his son, "[R]emember, what happens here stays here." The coworker testified that the victim came to work with

black eyes on at least seven occasions in the months leading up to her death.

¶ 40 The People argued that the evidence was admissible under CRE 404(b) as evidence of Jackson's state of mind and to rebut claims of self-defense or recent fabrication, and under section 18-6-801.5, C.R.S. 2024. Jackson objected.

¶ 41 The court allowed the prosecution to introduce the evidence at trial. It concluded that the evidence of ongoing domestic violence was "logically relevant to material issues in this case" because it "help[ed] to explain[] the responses and actions of the victim in this matter and the Defendant's behavior on the night of the offense." The evidence also "show[ed] an ongoing pattern of physical assaults similar to what is alleged to have occurred that resulted in the death of the victim" and was relevant to establish intent and to disprove any claims of accident or self-defense. The court found that the evidence's relevance was independent of any intermediate inference of act propensity and that "the probative value of the proposed evidence in this matter substantially outweigh[ed] the danger of unfair prejudice to the Defendant."

¶ 42     At trial, the prosecution presented the testimony of the child care provider and the coworker, and the court read the jury a limiting instruction before each witness testified. The court said that the evidence was being offered to prove Jackson's state of mind and to rebut any claim of self-defense or recent fabrication.

¶ 43     At the jury instruction conference, defense counsel asked the court to strike the language, "to rebut any claim of self-defense or recent fabrication," from the written limiting instruction because neither defense theory was at issue in the case. The court agreed. The final jury instruction read: "The evidence that you heard from [the child care provider and the coworker] was presented for the limited purpose of showing [Jackson's] state of mind at the time of the offense. You may not consider it for any other purpose."

### B.     Applicable Law and Standard of Review

¶ 44     Evidence of other uncharged crimes or acts is "not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." CRE 404(b)(1). But such evidence may be admissible for other purposes. CRE 404(b)(2); *Rojas v. People*, 2022 CO 8, ¶ 28 ("[C]ourts can

admit uncharged misconduct evidence for almost any non-propensity purpose.").

¶ 45    Under *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990), prior act evidence is admissible if (1) the evidence relates to a material fact, (2) the evidence is logically relevant, (3) the logical relevance is independent of the prohibited inference that the defendant was acting in conformity with his bad character, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.  Before admitting prior act evidence, the trial court must be satisfied, by a preponderance of the evidence, that the prior act occurred.  *People v. Garner*, 806 P.2d 366, 373 (Colo. 1991).

¶ 46    In cases involving domestic violence, prior acts of violence may be admitted "to show a common plan, scheme, design, identity, modus operandi, motive, or guilty knowledge or for some other purpose." § 18-6-801.5(3).  Indeed, given the cyclical nature of domestic violence, the General Assembly has declared that "evidence of any other acts of domestic violence between the defendant and the victim" can be helpful and necessary "in some

situations in prosecuting crimes involving domestic violence." § 18-6-801.5(1), (2).

¶ 47    We review a trial court's evidentiary rulings for an abuse of discretion. *Rojas*, ¶ 16. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or based on an erroneous understanding of the law. *People v. Dominguez*, 2019 COA 78, ¶ 13. Where a claim of error was preserved, we apply the harmless error standard of reversal. *Hagos v. People*, 2012 CO 63, ¶ 12.

## C.    Application

¶ 48    Jackson first argues that the trial court erred when it found, by a preponderance of the evidence, that the prior instances of domestic violence occurred. The court relied on the testimony of two witnesses who observed the victim with a black eye and who observed the victim's demeanor and hesitance to discuss how she was injured. One of those witnesses testified that the victim identified Jackson as the one who hit her. We perceive no error in the court's assessment that the foregoing evidence was sufficient to establish the fact of the prior domestic violence by a preponderance of the evidence. *See Garner*, 806 P.2d at 370 ("A fact is established

by a preponderance of the evidence when, upon consideration of all the evidence, the existence of that fact is more probable than its nonexistence.").

¶ 49 We are similarly unpersuaded by Jackson's challenge to each prong of the court's *Spoto* analysis.

¶ 50 "The first prong of the *Spoto* test is the easiest to satisfy." *Yusem v. People*, 210 P.3d 458, 464 (Colo. 2009). A fact is material if it is of consequence to the determination of the action. CRE 401. Here, the prosecution had the burden to prove that Jackson either knowingly or recklessly caused the victim's death. §§ 18-3-103(1)(a), -104(1)(a), C.R.S. 2024. Jackson admits that his state of mind was a material fact. Nevertheless, he argues that the prosecution did not prove that he was the one who caused the injuries, and absent any causal connection, the evidence did not relate to his state of mind. He also argues that the prior incidents were too remote in time to be relevant to his state of mind. Having just rejected the argument that the prosecution did not prove Jackson caused the injuries, we conclude that the proffered evidence related to the material fact of Jackson's state of mind. And in the context of a violent domestic relationship, a few months

24

is sufficiently close in time to be relevant to Jackson's state of mind. *See People v. Cross*, 2023 COA 24, ¶ 25 (holding that instances of domestic violence three years before the incident were admissible because they were "substantially similar").

¶ 51    To satisfy the second prong, the prosecution "need only show logical relevance — that the prior act evidence has *any* tendency to make the existence of the material fact more or less probable than without the evidence." *Yusem*, 210 P.3d at 464-65. Jackson's past episodes of violence toward the victim made it more likely that he caused her death either knowingly or recklessly, particularly here, where, in opening statements, Jackson's counsel suggested that the victim fell and hit her head by accident. *See People v. Fry*, 74 P.3d 360, 370-71 (Colo. App. 2002) (evidence of other acts of domestic violence related to the defendant's intent when he denied hitting the victim), *aff'd*, 92 P.3d 970 (Colo. 2004). The specific rationale or explanation for Jackson's prior acts of domestic violence are not necessary to establish relevance in a domestic violence case involving the same victim. *See Cross*, ¶ 22.

¶ 52    Regarding the third prong, the evidence was logically relevant independent of an impermissible propensity inference. *See Spoto*,

25

795 P.2d at 1318. "This requirement is met where there is 'similarity' between the charged and uncharged acts, showing a 'specific tendency' on the part of the defendant." *People v. McBride*, 228 P.3d 216, 227 (Colo. App. 2009) (quoting *Yusem*, 210 P.3d at 466-67). In *McBride*, the defendant had a specific tendency to "act violently against the victim when he became frustrated." *Id.* Here, the evidence showed that Jackson had a specific tendency to hit the victim in the face and head during arguments, as demonstrated by the testimony of two witnesses who confirmed the victim's consistent and repeated facial injuries in the months before her death. That evidence made it more likely that Jackson engaged in the same behavior on the evening in question, which in turn made it more likely that he knowingly (or at least recklessly) caused her death, not because of his character, but because of his specific pattern of demonstrated behavior.

¶ 53  Further, the prior acts occurred just months before the charged conduct and involved almost identical claims of abuse against the same victim. *See id.* The fact that the incident resulted in the victim's death while the previous instances did not is inapposite. True, any bad act evidence could support a propensity

26

inference. But *Spoto* "does not demand the absence of the inference"; it "merely requires that the proffered evidence be logically relevant independent of that inference." *People v. Snyder*, 874 P.2d 1076, 1080 (Colo. 1994).

¶ 54 Regarding the fourth prong, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See Spoto*, 795 P.2d at 1318. The General Assembly recognizes the high probative value of prior acts of domestic violence. § 18-6-801.5(1). Here, the evidence was probative of Jackson's mental state, an element that the prosecution had the burden to prove and that the defense contested at trial. And while the evidence may have been prejudicial, it was not unfairly so. *See People v. Griffiths*, 251 P.3d 462, 466-67 (Colo. App. 2010) ("Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403.") (citation omitted). Our conclusion is bolstered by the fact that the court gave a limiting instruction and excluded some prejudicial testimony that did not support the prosecution's evidential hypothesis. *See People v. Cooper*, 104 P.3d 307, 309 (Colo. App. 2004) (limiting instruction

27

alleviates danger of unfair prejudice); *People v. Penrod*, 892 P.2d 383, 385 (Colo. App. 1994) (finding no abuse of discretion where the trial court "excised the irrelevant and most prejudicial information" before admitting the evidence contested under CRE 403).

¶ 55    For these reasons, the trial court did not abuse its discretion by admitting the prior act evidence.

¶ 56    Finally, Jackson challenges the court's contemporaneous verbal limiting instructions on two grounds.  First, Jackson asserts that the court's statement, "So it is not necessarily offered for the purposes of determining directly any way of the guilt or innocence of the Defendant," was confusing.  Defense counsel did not contemporaneously object, and counsel on appeal has cited no authority suggesting that the court's statement was an obvious error.  Second, Jackson asserts that the instructions were flawed because they cited limited purposes that were not at issue in the trial.  However, any prejudice created by the verbal instructions was cured when the court, upon objection by defense counsel, edited the written limiting instruction to include only state of mind before the jury deliberated.

## IV. Prosecutorial Misconduct

¶ 57 Jackson next claims that the court erred by allowing the prosecutor to misrepresent evidence during closing argument. We are unpersuaded.

¶ 58 "We engage in a two-step analysis when reviewing claims of prosecutorial misconduct." *People v. Licona-Ortega*, 2022 COA 27, ¶ 85. "First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances." *Id.* "Second, we decide whether the misconduct warrants reversal under the applicable standard." *Id.*

¶ 59 Although prosecutors have "wide latitude in the language and style they choose to employ" during closing arguments, they may not misstate the evidence or the law. *People v. Payne*, 2019 COA 167, ¶ 46. Nor may prosecutors use closing argument to mislead the jury. *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005). Where defense counsel objected to the claimed misconduct, we review for harmless error. *Hagos*, ¶ 12.

¶ 60 During closing argument, the prosecutor made the following remarks:

> After this mutual physical altercation between them, the Defendant indicates to detectives that they go back to sleep . . . . The next time he wakes up to check on her, he believes she is not breathing. In fact, he tells the detectives, she's practically dead. What does he do? He represents that he tries to check to see if there are life signs to see if she's breathing, performing CPR, to no avail.
>
> But he does say something in the interview that I would ask you to pay particular attention to is, while she's not breathing, she is still warm. At this time, he doesn't go and call for help, he doesn't run out to contact neighbors. He does nothing.

Defense counsel objected, asserting that the prosecutor misstated the evidence. The court overruled the objection.

¶ 61 Jackson now asserts that by saying, "He does nothing," the prosecutor misrepresented the evidence because Jackson, in fact, performed CPR. The prosecutor did not misrepresent the evidence. In context, "nothing" related to Jackson's efforts to seek help after realizing that the victim was not breathing but was still warm. This is clear from the prosecutor's limiting phrase "[a]t this time."

¶ 62 The prosecutor explicitly acknowledged Jackson's efforts to resuscitate the victim just moments before, undercutting Jackson's argument that the prosecutor misrepresented the evidence by

omitting a critical detail. Further, the jury heard details about Jackson's efforts to assess the victim's condition and perform CPR during the interrogation video, belying any chance that the jury was misled by the prosecutor's argument.

## V.    Costs of Prosecution

¶ 63    Finally, Jackson claims that the court erred by awarding the victim's mother's travel expenses as costs of prosecution. We agree.

¶ 64    After trial, the prosecution moved for $908.96 in reimbursement costs to pay for the victim's mother's lodging, meals, airfare, and airport shuttle during the trial. Jackson objected because the victim's mother was an observer rather than a trial witness. The court granted the prosecution's motion without identifying the subsection of the costs of prosecution statute, § 18-1.3-701, C.R.S. 2024, under which it entered the order and without making factual findings.

¶ 65    The costs of prosecution statute provides, "When any person . . . is convicted of an offense, the court shall give judgment in favor of the state of Colorado, the appropriate prosecuting attorney, or the appropriate law enforcement agency and against the offender for the amount of the costs of prosecution . . . ." § 18-1.3-701(1)(a).

"'Costs of prosecution' under section 18-1.3-701 refers to the costs of a formal criminal proceeding." *People v. Sinovcic*, 2013 COA 38, ¶ 15. The statute sets out specific awardable costs to the prosecution as well as a catchall provision for other "reasonable and necessary" costs. § 18-1.3-701(2); *see also Sinovcic*, ¶ 16 (referring to section 18-1.3-701(2)(j), the former location of subsection 18-1.3-701(2)(j.5), as a "catch-all provision").

¶ 66    Subsection (2)(e) provides that the prosecution may recover witness fees and mileage, and for witnesses required to travel more than fifty miles from their place of residence, additional lodging and transportation costs. § 18-1.3-701(2)(e). Separately, subsection (j.5), the catchall provision, provides that, "at the discretion of the court," the prosecution may recover "any other reasonable and necessary costs incurred" that are "directly the result of the successful prosecution of the defendant." § 18-1.3-701(2)(j.5).

¶ 67    District courts have discretion whether, and in what amount, to assess costs of prosecution. *Sinovcic*, ¶ 9. But whether the court has the statutory authority to assess particular costs as costs of prosecution is an issue of statutory interpretation that we review de novo. *Id.*

¶ 68   On appeal, Jackson asserts that we should reverse the award because the costs of prosecution statute allows for the reimbursement of travel expenses for subpoenaed witnesses, but not for trial observers. § 18-1.3-701(2)(e). The People do not contest that the victim's mother was an observer, not a witness. Instead, they argue that the award was appropriate under the statute's catchall provision.

¶ 69   The People correctly note that, under the Victim Rights Act, the prosecution was required to inform the victim's mother of the availability of transportation to and from the trial. S*ee* § 24-4.1-303(11)(f), C.R.S. 2024. But the People do not explain why a trial observer's lodging, meals, airfare, and airport shuttle — even if reasonable expenses — were "necessary" costs of a "formal criminal proceeding" under the costs of prosecution statute. § 18-1.3-701(2)(j.5); *Sinovcic*, ¶ 15. Nor do they explain why such "reasonable" costs would also be "necessary" because the prosecution was required to inform the victim's mother of the availability of transportation to and from the trial. Finally, the People do not suggest that the presence of the victim's mother at

trial was in any way important to the prosecution's trial presentation.

¶ 70 Because the costs of prosecution statute requires that recoverable costs are both reasonable *and* necessary, and the People have provided us with no basis with which to consider the requested costs necessary, we reverse the court's order granting the prosecution's motion for costs. (In reaching this conclusion, we do not suggest that the parent of a deceased victim cannot recover reasonable travel expenses to attend trial from a victim compensation fund or under another statute not argued here. *See, e.g.,* § 18-1.3-602(3.7), C.R.S. 2024.)

## VI.   Disposition

¶ 71 We affirm the judgment of conviction and reverse the court's order granting the prosecution's motion for costs.

JUDGE PAWAR and JUDGE LUM concur.